Lonnie HOLLAND, Appellant,

v.

CHILDERS COAL COMPANY et al.,
Appellees.

Court of Appeals of Kentucky.

Nov. 20, 1964.

Francis Dale Burke and Dan Jack Combs, Pikeville, for appellant.

Robert Matthews, Atty. Gen., Edward R. Hays, Baird & Hays, Pikeville, J. Keller Whitaker, Ex. Sec. Ky. Wkmn's Comp. Bd., Frankfort, for appellees.

PALMORE, Judge.

The appellant, Lonnie Holland, sustained a relatively minor physical injury from an accident arising out of and in the course of his employment as a coal loader in a mine. The injury resulted in a permanent functional impairment of approximately 10%. This physical impairment, however, precipitated or "triggered" a psychosomatic mental condition from which Holland was completely (though probably temporarily) disabled and confined in a mental institution at the time the hearing on his workmen's compensation claim was concluded. He appeals from a judgment confirming an award of the board based on a finding of 20% permanent partial disability.

The scope of our review is to determine whether there was substantial evidentiary basis for the finding of but 20% disability.

At the time of the accident Holland was 49 years of age and, except for unrelated matters of no apparent consequence here, had always been in good health. At about noon on October 9, 1962, while on his hands and knees gathering up loose coal he was struck "around my neck and back plum

down" by falling slate. He experienced a sensation that "seemed like electric run down my legs and arms. * * * The right leg and arm," and thought his shoulder was broken. His employer took him home and he did not work any more that day. He returned to the mine and "tried" to work on each of the next three days, remaining throughout the shift, but "was just in the way." He says he was suffering pain in the back and could not do any lifting.

On October 13, 1962, Holland went to see Dr. Ballard Cassady, a physician and surgeon, at the Methodist Hospital in Pikeville. Dr. Cassady had X-rays taken of his back (which proved negative) and administered treatment for muscle strain. On October 18 Holland tried again to work at the mine, and stayed all day, but (as he relates it) could not perform and so reported to his employer. His right hand was numb and he had pains in his legs and back "from the neck down." He returned to Dr. Cassady, who then caused his neck to be X-rayed. The neck X-rays disclosed a marked narrowing of the 6th cervical interspace, which to Dr. Cassady indicated strong possibility of a herniated disc. Holland was re-admitted to the hospital and placed in cervical traction from October 26 to November 27, 1962, after which he was released and put in a neck brace, the pain having moderated and the "numbness and tingling" having disappeared.

At this juncture it was Dr. Cassady's opinion that Holland was "unable to do any type of manual labor," but he would not estimate the probable duration, because he thought the patient would have to be referred to a neurosurgeon for further examination, diagnosis (by cervical myelogram) and treatment, in the absence of which "his disability could continue indefinitely."

Meanwhile this compensation proceeding had been filed, and on January 17, 1963, Dr. Ralph Angelucci, of Lexington, a neurosurgeon, examined the claimant in behalf of the defendant employer and "could not

determine anything of consequence on clinical examination." Holland was wearing his neck brace and "was helped into the office by his wife," the reason for which Dr. Angelucci says he does not know, since the patient did not otherwise "demonstrate any problems in locomotion." He felt that Holland was exaggerating his pain and weakness, since they were not objectively supported except for X-ray findings "which revealed the narrowed interspace which is certainly present in a lot of people without all of this difficulty."

Dr. Angelucci observed arthritic spurring in the cervical spine. The interspatial narrowing appeared to be of earlier origin than October 9, 1962, but could have occurred at that time. On sensory examination Holland "demonstrated a hypesthesia of the entire right half of the body, including the face." The possible source or significance of this symptom elicited only the comment, "Of course that is not a neurological problem." It was Dr. Angelucci's conclusion that there was not enough indication of a herniated disc to warrant a myelogram.

In view of the X-ray disclosure of a narrowed cervical interspace Dr. Angelucci estimated that Holland has a permanent "impairment in function" of approximately 10% of the body as a whole. Whether this resulted from the injury, a pre-existing arthritic condition, or both, he did not undertake to say. With respect to Holland's other symptoms, including insensitivity to pin pricks in the right half of his body, the doctor said he was "either faking or emotionally upset." He would not, however, accuse him of malingering, and admitted that "in view of this man having this multiplicity of problems, his difficulty in walking, his little wife having to help him along, his difficulty in swallowing that would have nothing to do with this problem, the hypesthesia of the entire one-half of the body, pain in the small of the back, without any objective findings, and all this multiplicity of complaints," he is not presently fit for

employment as a coal miner. His prognosis was as follows:

"I think it is a matter of rehabilitation on this man, make him understand his problem and treat him not only as far as his neck findings are concerned but try to rehabilitate him on his mental attitude or outlook toward life. That would be my feeling about it, with reassurance, psychotherapy and that sort of thing. At least that is the way I would attempt to rehabilitate this man. I think it will be a difficult job, but I think it could be done."

On the basis of the evidence summarized thus far the referee, expressing difficulty in deciding the case, found a 20% permanent partial disability from the injury but suggested that the board have the claimant examined further by a disinterested physician. The referee's opinion was rendered September 17, 1963, at which time the latest information in the record was Dr. Angelucci's testimony from the physical examination conducted by him on January 17, 1963.

On November 7, 1963, pursuant to KRS 342.315, the board appointed Dr. T. Rothrock Miller, an orthopedic surgeon, to examine the claimant. In the meantime Holland's physical condition had remained unimproved and his mental condition had deteriorated badly. Recalled for supplementary testimony, Dr. Cassady reported that on November 20, 1963, he "was now unable to feed himself, or dress himself, and is practically a bed patient, and in the office he was very restless and agitated. He was noncommunicative and attempt to examine him was done, and only a superficial examination could be done because of inability of the patient to cooperate. * * * He was still wearing his neck brace when seen on the 20th," etc.

On the date of the last examination by Dr. Cassady, November 20, 1963, Holland was committed on a certificate of the county health officer to Eastern State Hospital for observation, and he was a patient at that institution when taken to Dr. Miller's office for examination on December 17, 1963.

Dr. Miller found the patient "so withdrawn that it was impossible to obtain any history from him and it was only with extreme difficulty that any comment at all could be extracted from him. * * * He sat quietly, saying nothing, continually picking at the hair over his left temple with his left hand," and had picked a bald spot on his head. The only objective findings Dr. Miller could make were from X-ray examination, which again revealed a marked narrowing at one of the cervical interspaces and also showed evidence of degenerative arthritis in the neck area. His report concluded as follows:

"I doubt that the arthritis is on the basis of trauma although may have been aggravated by it. I do not believe that his present physical condition would permit his returning to the occupation of a miner but I am unable to state what bearing, if any, the injury of October 9, 1962, might have on his present condition. His emotional state is such that this would preclude any type of employment and I do not believe he would respond satisfactorily to any type of treatment until this has improved."

The latest information in the record concerning Holland's condition was provided by the testimony of Dr. Arthur L. Robertshaw, a psychiatrist and departmental director at Eastern State Hospital, given on January 27, 1964. He described the patient's behavior when first admitted in much the same way as did Dr. Cassady on his last examination. Holland's condition was diagnosed as psychotic depressive reaction and he was put on a course of tranquillizing drugs and electro-shock treatment, "with very marked improvement in his mental condition, so that presently he is no longer depressed and he no longer complains of pain in his neck or arm" and "is approaching the time when his discharge can be expected." As to the future, when released he should be able to work but would be subject to possible recurrence of his depressive state.

From X-rays, Dr. Robertshaw had observed the aforementioned narrowing of

one of the cervical interspaces as well as the signs of degenerative arthritis. From these he concluded that Holland had some degree of physical disability,[1] and it was his opinion that this disability had in turn "triggered off a psychosomatic mental condition which further magnified his symptoms and which was accompanied in increasing amounts by a depressive reaction. * * * The complicating factor in these cases is the presence of both a physical and a mental condition, and the mental condition does magnify the symptoms, but the mental condition is a very real component of the total picture. * * * This mental condition is an actual mental illness as evinced by marked retardation, withdrawal, slowing down of mental and bodily functions and misery."

After Dr. Miller had filed with the board his report indicating degenerative arthritis as a causal factor in Holland's disability the defendant employer moved for and obtained an order making the Subsequent Claim Fund a party defendant. KRS 342.-120(1); Alva Coal Corporation v. Ealy, Ky., 367 S.W.2d 833 (1963).

Upon full board review the referee's finding of 20% permanent partial disability to the body as a whole resulting from the accident was confirmed, and the Subsequent Claim Fund was determined not to be a proper party and was dismissed.

There are three distinct questions against which the evidence must be measured, being the (1) causation, (2) extent and (3) duration of the disability.

The board specifically found that Holland sustained an injury arising out of and in the course of his employment, and there is no contention that this finding is not supported by sufficient evidence. Therefore it is conclusive.

KRS 342.120(1) provides for joining the Subsequent Claim Fund if it appears that the claimant (a) was already to some ex-

tent disabled at the time of sustaining a subsequent compensable injury or (b) had a dormant nondisabling disease condition which was lighted into an actual disability by a subsequent compensable injury. So far as relevant to this proceeding, (a) there is no evidence that Holland was to any extent already disabled at the time of the accident and (b) despite testimony indicating the presence of a degenerative arthritic condition in the cervical region the board's dismissal of the Subsequent Claim Fund was necessarily a determination that Holland's condition did not result in part from pre-existing disease.

What the board appears to have done in this case is to find that Holland's physical or functional disability is entirely attributable to the accident of October 9, 1962, and that the ensuing mental or emotional complications are not attributable to the accident.

Insofar as its finding of causal connection between the accident and the disability relates to that aspect of the disability that is purely physical, neither party complains.[2] Hence our further analysis can be and is cast upon the premise that the accident was the sole cause of the physical disability.

With respect to causal connection there is no tenable basis on which a line can be drawn between consequences that are purely physical and those that are part physical and part mental. The brain and nervous system are parts of the body. They affect and are affected by the functioning of the rest of the physical apparatus. Certainly what we identify as mind and emotion are direct products of a wholly physical process. If the psychosomatic illness described by Dr. Robertshaw was precipitated or "triggered," as he says, by a physical disability that the board has found to have resulted from the accident, then the causal relationship between the accident and the over-all disability is complete and unbroken.

1. On the basis of a hypothetical question he assumed that this physical disability resulted from the injury of October 9, 1962.

2. There is no cross-appeal.

Aside from the indication of degenerative arthritis, which was eliminated as a causal factor by the board's dismissal of the Subsequent Claim Fund, and aside from the possibility of malingering, an accusation no witness was willing to make, the record contains nothing whatever to suggest that any part or aspect of Holland's over-all disability originated from a cause other than the accident and injury of October 9, 1962. It is possible, of course, to speculate that he was emotionally unbalanced, but there is no proof to that effect. Moreover, KRS 342.120(1) (b) relieves the employer from the consequences of a dormant nondisabling infirmity only if it is a "disease condition." A low-threshold emotional breaking point, as such, could hardly be so classified.

This court has held disability from traumatic neurosis to be fully compensable if the originating or precipitating trauma arises out of and in the course of the employment. Stone v. Arthur Hewitt Designs, Inc., Ky., 358 S.W.2d 513 (1962); Eastern Coal Corporation v. Thacker, Ky., 290 S. W.2d 468 (1956). According to Dr. Robertshaw, "the difference between psychoneurosis and psychosis is that in the psychoneurosis the patient still retains his insight. He realizes he is ill and he asks for psychiatric help." In space age vernacular the psychotic might be described as farther out. From the standpoint of causation, we perceive no logical distinction between traumatic neurosis and a psychotic depressive reaction resulting from an injury.

Dr. Robertshaw did not deny that anxiety over his compensation claim probably figured in Holland's condition,[3] and we recognize the existence of so-called "compensation neurosis" and the difficulty of distinguishing this type of ailment from malingering. Cf. Larson on Workmen's Compensation, § 42.24, p. 619; Commonwealth, Dept. of Highways v. Lindon, Ky., 380 S. W.2d 247 (1964). But as Larson suggests, if the mental illness is genuine the line of causation from the original injury to the existing disability is not broken by the fact that anxiety over compensation is a factor in it. Whether the claimant is malingering is a question that is not beyond the competence of the fact-finding agency to resolve.

We conclude that the board, having found that Holland's physical impairment resulted exclusively from the accident, had no alternative but to find that his entire disability resulted from the same cause.

With regard to the extent of disability, Dr. Angelucci made it clear that his approximation of 10% was intended to reflect only the purely functional impairment. He conceded that the multiplicity of other complications, mental or emotional, added up to a man who was not fit to work and was in need of "difficult" rehabilitative therapy. In the whole of the testimony there is not a scintilla of evidence that Holland was not totally disabled until the last deposition was taken from Dr. Robertshaw, at which time his recovery was imminent but he had not yet been discharged from the hospital. To the contrary, the testimony of every witness points to an inescapable conclusion that he was totally and continuously disabled from the time of the accident and would remain so until released from the hospital.

This brings us to the last question, that of duration. We find no fault with the award for permanent partial disability but are of the opinion that, subject to the maximum statutory limits (KRS 342.095), Holland should have been awarded compensation for temporary total disability until released from Eastern State Hospital. Upon remand further evidence may be taken to ascertain the release date and, of course, in event of a change of conditions the parties will have resort to the reopening provision of KRS 342.125(1).

The cause is reversed for further proceedings consistent with this opinion.

3. He has a wife and nine children to support.

**298**

MONTGOMERY, J., dissenting.

MONTGOMERY, Judge (dissenting).

I respectfully dissent because I feel that the appellant's mental condition and accompanying total disability are not properly shown to have arisen from and out of the course of his employment. This condition arose twelve months or more after the injury to his neck and shoulder was suffered. To use the language of the majority opinion, it would require a long fuse indeed to "trigger" such a delayed action.

A further reason is that the Board made a finding of 20% permanent partial disability on the same record now considered by this Court. This finding is supported by the testimony of the claimant and Dr. Angelucci. The majority opinion does not condemn the Board's finding as clearly erroneous or as not being supported by substantial probative evidence. In the absence of such a conclusion, the Board's finding approved by the circuit court should be affirmed. It is unnecessary to cite the many cases that so hold.