**DEPARTMENT OF ECONOMIC SECURI-TY, Appellant,**

**v.**

**Ben ADAMS, etc., et al. (Ben Adams, Commissioner of Industrial Relations, and John W. Young, Custodian of Special Fund, and Workmen's Compensation Board), Appellees.**

Court of Appeals of Kentucky.

Feb. 20, 1970.

Baird & Hays, Pikeville, for appellant.

Friend & Mullins, Pikeville, Thomas R. Emerson, J. Keller Whitaker, Frankfort, for appellees.

PALMORE, Judge.

Ben Adams sustained an injury to his back on June 4, 1965, in the course of his employment by the Department of Economic Security in the "Happy Pappy" program. His claim for workmen's compensation disability benefits resulted in an award finding him 40% permanently disabled and apportioning 25% against the Special Fund and 15% against the employer. KRS 342.-120. Claiming 100% disability, Adams appealed to the circuit court. KRS 342.285. Upon its review of the record made before the Workmen's Compensation Board the circuit court adjudged that Adams is totally and permanently disabled, entirely as the result of the accident on June 4, 1965. Since, however, the Special Fund had not appealed from the award fastening liability upon it for the equivalent of a 25% permanent partial disability, the judgment of the circuit court, as we construe it, entitles the employer to recoup from the Special Fund the same dollar amount the Special Fund would have been required to pay under the award made by the board.

The employer appeals from the circuit court judgment, KRS 342.290, contending that the evidence before the board did not demand a finding of total disability. The employer contends also that if the judgment is affirmed, thus requiring the board to enter an award based on permanent total disability, payment should be apportioned between it and the Special Fund on the same 5 to 3 ratio as the original award.

We shall dispose of the latter argument first. The judgment of the circuit court was to the effect that the disability

was wholly attributable to the accident, without contribution by a pre-existing, nondisabling disease condition. Cf. KRS 342.120(1) (b). This would have placed the entire liability on the employer had the Special Fund appealed from the award of the board, but by its failure to appeal the Special Fund waived any right to bring about a reduction in its liability as fixed by the board. Neither, however, did the employer appeal. Therefore, its posture in the circuit court also was purely defensive. It had no more of a claim in that court against the Special Fund than it did against the claimant himself. Though based on a 5 to 3 apportionment, the award was made in terms of money. The claimant, who had appealed against both defendants, was in the position of being able to press claim against either or both of them for more money, but neither of them, as between themselves, was in a position of being able to require the other to pay more than it was required to pay under the award from which they had both failed to appeal. Each was vulnerable to the claimant, but as between themselves the board's award was final.

It is only through the fortuitous circumstance that the Special Fund did not appeal that the employer can be reimbursed in any amount at all. In this respect the judgment appears to be correct.

■ We come now to the gritty core of the case, which calls for an evaluation of the evidence to determine its procedural effect. All parties agree that since the claimant had the burden of proof on the issue of permanent total disability and the board found against him on that issue, the question is whether the proof in his favor was so persuasive as to make it clearly unreasonable for the board not to be convinced by it. Griffith v. Blair, Ky., 430 S.W.2d 337, 339 (1968); South 41 Lumber Company v. Gibson, Ky., 438 S.W.2d 343, 344 (1969). We think it was, but before entering upon an analysis of the evidence it is necessary to explain that this case arose prior to the effective date (Novem-

ber 1, 1968) of our decision in Osborne v. Johnson, Ky., 432 S.W.2d 800 (1968), and is thus to be decided under the so-called *Leep* rule (Leep v. Kentucky State Police, Ky., 366 S.W.2d 729), to the effect that if a man cannot perform the work of his *usual occupation* and his capacity to perform other kinds of work is impaired, he is totally disabled.

This man's normal occupation was that of a coal miner, though at the time of the accident he had been out of a job in the mines and had found employment with the Division of Public Assistance, Department of Economic Security. He was 39 years old, had no formal education, and could not read or write. Obviously, the most gainful employment ordinarily available to a man of his limited qualifications would be at hard labor.

On June 4, 1965, he and a fellow worker were lifting a 100-pound sack of alum from a truck. The other man released his hold before Adams let go of his end of the sack, resulting in a sudden strain on the lumbar area of Adams' back. The pain became worse over the next day or so, whereupon he was hospitalized for 10 days. He then went back to his job and was put on light work, but at the end of another month the pain in his back was such that he had to go into the hospital for another 10 days. Finally, on May 11, 1966, Dr. William C. Roland, an orthopedic surgeon at Ashland, Kentucky, performed a disc excision at the space between his fourth and fifth lumbar vertebrae. After release from the hospital on May 19, 1966, Adams was again seen by Dr. Roland on July 1, August 12, September 23, and November 25, 1966. On August 12 he reported several episodes of leg and back pain and had gained some weight. At this time Dr. Roland fitted him with a corset-type back support and cautioned him about overeating. On September 23 he said his back was doing "pretty well" but complained of soreness over his left posterior iliac spine. On November 25, 1966, when Dr. Roland last saw him, he "complained of some re-

sidual low back pain, smothering spells, abdominal distention and stated that he, 'can't stoop over' ". At this time, Dr. Roland later testified, "it was my feeling that Mr. Adams was * * * physically fit to return to his work program but, I recommended to the bureau of rehabilitation counselor that Mr. Adams should not be required to do any heavy work for an additional three months."

Adams testified in his own behalf on August 23, 1966. He said he was having pain all the time in his back and down his right leg and that at times he could not use his legs at all and his wife would have to help him get around.

Dr. Roland gave his deposition in behalf of the defense on March 16, 1967. Based on his prognosis of November 25, 1966, he was of the opinion that Adams was now able to return to hard work. Meanwhile, Adams had been examined by Dr. Russell Meyers, a neurosurgeon, and Dr. Meyers had given his deposition in which he stated the opinion that Adams was suffering from a herniated disc in the space between the 5th lumbar and 1st sacral vertebrae and would be completely disabled unless and until this condition is relieved by surgery. He did not record having noticed the scar left by Dr. Roland's surgery (a fact the board considered as "weakening" his opinion), but we are not inclined to attach much significance to that particular circumstance, since he knew from the case history given him by Adams that the operation had been performed. On cross-examination he suggested several possible explanations as to why the condition at L5–S1 would not have been discovered by Dr. Roland in the course of his myelographic and surgical procedures (Dr. Meyers did not use a myelogram).

Dr. Roland testified that neither the myelogram made prior to the operation nor the patient's clinical symptoms showed evidence of a disc protrusion at L5–S1 and that he did not explore that area during the surgical process. Commenting on Dr. Meyers' opinion that Adams was not able to resume arduous labor, he testified as follows:

"I don't know the neurosurgeon whom you quote personally, but many orthopedists and neurosurgeons feel that postoperative disc patients should not be permitted to do heavy work ever. I think it is desirable that they don't do arduous manual labor. My conclusion concerning the work that he might be expected to do on this work program was less arduous assuming that he no longer had to lift sacks of alum."

(The foregoing comment is significant in its disclosure that Dr. Roland's opinion of Adams' ability to resume normal labor was premised on the assumption that such labor thereafter would be less arduous than what he was doing at the time of the injury. This would seem to be a tacit admission that the man could not meet the demands of his "usual occupation.")

Dr. Roland estimated Adams' disability at 25% to the body as a whole, resulting from the lighting up of a previously existing degenerative condition of the spine.

In the face of the conflicting testimony of Drs. Meyers and Roland the board appointed Dr. Robert L. Keisler, an orthopedic surgeon of Louisville, Kentucky, to examine Adams, evaluate his condition, and apportion the disability if and as appropriate. KRS 342.121, 342.120. Dr. Keisler examined the patient on June 7, 1967, and on June 30, 1967, reported in part as follows (emphasis added):

"IMPRESSION: Post laminectomy syndrome *with emotional reaction*. No evidence of nerve root compression at this time.

"It appears that Mr. Adams sustained acute onset of back pain associated with rather *severe emotional reaction*. He describes passing out with pain from the early days of these symptoms and of course passing out is abnormal regardless of the severity of pain. Many of his symptoms at this time can only be

explained on an emotional basis. There are some symptoms which might suggest nerve root pressure, however, they are not distributed in the normal pattern of nerve distribution. *These can be explained on emotional basis however and are not uncommon*. There is a relative decrease in the right knee jerk, however, this is not seen with disc problems between L4–L5 or S1, in fact, it is not seen except with a rare high disc and x-rays are not compatible. There is no muscle atrophy and all of the sciatic tests are negative. It is my impression that Mr. Adams does have symptoms in his back, although he demonstrates minimal difficulty at this time. He does display what I feel is a *great deal of emotional reaction rather than any physical limitation*. I would estimate at this time from an orthopedic standpoint that Mr. Adams has an *orthopedic functional disability of 10 percent to the body as a whole*. Since I have no history of previous back symptoms or injuries I must assume that there was no pre-existing active disability and I have no evidence of pre-existent latent disability. The entire 10 percent would therefore be result of the described injury on June 24, 1965. For heavy work or lifting activities the impairment would be increased to 25 percent to the body as a whole * * *."

Adams filed exceptions to Dr. Keisler's report on several grounds, after which he took and submitted the deposition of Dr. Champ Ligon, a psychiatrist of Lexington, Kentucky, who on June 27, 1967, had given Adams a "standard psychiatric interview examination and physical and neurological examination, particularly with regard to his back."

At the time of Dr. Ligon's examination Adams was still wearing his back brace. He weighed 165 pounds as compared with 173 pounds when first seen by Dr. Roland in May of 1966. To make a long story short, Dr. Ligon diagnosed traumatic neurosis resulting wholly from the injury of June 24, 1965, and recommended psychiat-

ric hospitalization and treatment. "Present functioning intelligence (native intelligence as affected by psychological and physical symptoms) was estimated as inadequate for economic competitiveness at any productive level * * *. I would say that with treatment, the prospects of his returning to work would be fairly good and would modify 'treatment' by 'with adequate treatment.' * * * He would be unable to return to work if his condition continued as it was the day he was examined * * * he is not a malingerer, and the pain is very real to him."

Asked whether settlement of his compensation claim would alleviate the problem, Dr. Ligon replied as follows: "That would be one less factor he would have to worry about. It probably would not correct his present situation."

In its opinion and award the board overruled the employer's motion to strike Dr. Ligon's testimony as being evidence in chief rather than rebuttal proof. It also sustained the claimant's exceptions to Dr. Keisler's report, though it is apparent from the text of the opinion and award that the report actually was considered. In finding 40% permanent partial disability the board expressed the belief from Dr. Ligon's report that "the sooner this litigation is over and plaintiff returns to work the better off he will be."

Adams worked for 22 years in the mines and had no history of any physical, mental or emotional difficulty prior to his injury on June 24, 1965. Of the four doctors whose opinions are in this record not one said that he was able to do hard physical work as of the time he last saw him. Regardless of the conflict in evidence between Dr. Meyers and Dr. Roland as to whether Adams has a herniated disc at the L5–S1 interspace, neither of them considered or was questioned on the possibility of emotional or psychological involvement. It is a matter of common knowledge that such conditions can and do result from traumatic experiences. Disability from traumatic neurosis has been recognized by

this court as compensable. See Holland v. Childers Coal Company, Ky., 384 S.W.2d 293, 297 (1964), citing earlier opinions to that effect.

Though Adams did not seem to regard Dr. Keisler's report as helpful to his cause, in the light of Dr. Ligon's later report it seems to us that it is of considerable importance in that it expressly recognized the existence of a severe emotional problem which Dr. Keisler definitely did not attempt to evaluate in terms of disability. None of the physicians mentioned malingering except Dr. Ligon, who said Adams had "no insight into the possible psychological origins of his complaints" and "is not a malingerer." The board's attempt to prescribe successful treatment in the form of sending him back to work is not justified by the record and may have been somewhat beyond the scope of its professional competence.

It is our opinion that the evidence forbids a finding that Adams is able to work at the present time. But even if it be true that he can do less exacting work, as mentioned by Dr. Roland, he still is unable to resume his customary occupation at hard (or "arduous") physical labor. We observed in Deby Coal Company v. Caldwell, Ky., 383 S.W.2d 905, 907 (1964), that "in an occupation requiring strenuous physical labor a half man is no man." So indeed is a 60% man.

We acknowledge the cogency of the employer's argument that this "all or none" approach virtually eliminates permanent partial disability in the field of hard manual labor. That is why the *Leep, Deby Coal Company* and other similar cases were partially overruled in Osborne v. Johnson, Ky., 432 S.W.2d 800 (1968), in favor of a criterion of disability based on general employability vis-a-vis the employe's usual occupation. But as heretofore indicated, the *Osborne-Johnson* rule was given prospective effect from Novem-

ber 1, 1968. This case compares with South 41 Lumber Company v. Gibson, Ky., 438 S.W.2d 343 (1969), and requires a disposition consistent with its rationale.

EDWARD P. HILL, Jr., C. J., and MILLIKEN, NEIKIRK, REED and STEINFELD, JJ., concur.