George **JOHNSON**, Appellant,

v.

**SKILTON CONSTRUCTION COR-
PORATION, Appellee.**

Court of Appeals of Kentucky.

June 4, 1971.

Keen W. Johnson, Charles T. Walters, Winchester, for appellant.

Nolan Carter, Jr., Allen, Duncan & Arnold, Lexington, J. Keller Whitaker, Frankfort, for appellee.

PALMORE, Judge.

The appellant, George Johnson, injured his right hand while working as a general laborer for the appellee Skilton Construction Corporation on a construction job. His ensuing claim for workmen's compensation resulted in an award for 27% permanent partial disability. On the employer's appeal the Fayette Circuit Court held that the award was not supported by substantial evidence and remanded the proceeding to the board "for an award conforming to the evidence and this opinion." The claimant appeals to this court. Whether the evidence supports a finding of permanent disability and, if so, whether it supports a finding that the extent of such disability is 27% are the questions submitted.

The injury occurred in September of 1968. The compensation hearing at which Johnson testified was held in November of 1969, some 14 months later. At the time of the hearing Johnson was 42 years of age and was employed by a transfer company as a truck driver at an average wage of $100 per week as compared with $138 per week he had been earning with Skilton. The evidence did not disclose his earnings prior to the construction job for which he was hired by Skilton. He did say that he was a common laborer by trade and that he had worked for the transfer company at some unspecified time before taking the construction job.

The injury was a fracture of the distal portion of the fifth metacarpal, which is the bone in the hand above the little finger. According to two orthopedic specialists, such a fracture ordinarily heals completely within six weeks, and they were of the opinion that Johnson has no residual disability whatever, despite a slight deformity in alignment. On the other hand, Johnson testified that he still has pain and intermittent swelling and that there are many ways in which he can no longer effectively use his right hand.

Evidently the injury occurred when Johnson slipped and fell on a pile of rocks. At that time his assigned job consisted of tending an air hose connecting a compressor with a pavement breaker, and he was able to continue working in somewhat of a one-handed fashion. Three or four days later, however, he was directed to operate a jack-hammer and could not do it, whereupon he was re-assigned to the lighter work of handling the air hose. He remained on the job for several days or weeks until laid off incident to a reduction in force as the construction project approached completion.

Johnson did not seek medical attention until January of 1969, when he went to see Dr. John S. Hubbard, a general practitioner, at Winchester. The hand was still swollen and painful, but X rays showed that the bone fracture was healing, and no treatment was prescribed or administered. Dr. Hubbard saw Johnson once more, on November 19, 1969, and described his condition as follows:

A. "Well, his hand, to casual observation, was almost normal. There probably was a very slight limitation at the site of the old fracture. There was a slight defect in full extension of his fifth digit. He could extend it fully, but with effort and likewise he could adduct his fifth digit completely only with effort."

Q. "Now would you please explain the word adduct?"

A. "To bring his little finger into his fourth finger, and to extend it fully he had to just strain to get it to full extension.

Q. "So there has not been 100% healing of the hand as yet?"

A. "Not 100%, at this time."

Q. "Do you anticipate that there will be?"

A. "Well, I had anticipated the full recovery back when I saw him in January."

Q. "Would it be possible for you to state a percentage of recovery, if it is possible?"

MR. CARTER: "I want to object to that as not being a test of disability of any kind. The doctor can answer it, if he knows, but I want to object to it on that basis."

A. "I could give an opinion."

Q. "Well, if you have an opinion would you give that?"

A. "At the present time?"

Q. "I am just trying to find some degree of healing that has taken place in the hand."

A. "I would say 90% would be my opinion at the present time."

Q. "Do you have any opinion as to how long it will take for the hand to heal the other 10%?"

MR. CARTER: "Object to the form of the question."

A. "I wouldn't be able to give an opinion."

\* \* \* \* \* \*

Q. "How long a period of time, in your opinion, would it have been until he could have worked at those jobs without pain in his right hand?"

A. "Without pain?"

Q. "Right."

A. "Well, even now he still has pain, so presumably he would have had pain from then until the present on that job."

Q. "So it is your opinion that at present he would not be able to do that type of work without pain?"

A. "That is without pain, yes."

Q. "Do you have any opinion as to at what time in the future he would be able to do that type of work without pain?"

MR. CARTER: "I will object to that question on the grounds that it makes the doctor some sort of fellow that can see in the future and speculate, and I don't think the doctor wishes to do that."

A. "I wouldn't be able to give a date on that."

Q. "You do not know at what date in the future he might be able to work again at that type of work and not have pain?"

A. "That is right."

\* \* \* \* \* \*

Q. "Mr. Carter asked you a question about the fact as to whether or not your opinion was that although he could physically do the work he would still have pain in the hand, and that's what you were basing your opinion on that he could not do the work; isn't it true that at the time you saw him he could not completely straighten the finger; is that not right?"

A. "That is right."

Q. "And he would have a problem physically with gripping; is that correct?"

A. "That is right."

Q. "Doctor, in your opinion, what type of work could he have performed without pain after the injury?"

A. "Well, of course it would have to have been more or less of an office type of work, or bookkeeping or something that he would be able to do with one hand."

Q. "Then in other types of work he would have pain performing the functions of the job?"

A. "Yes."

Q. "I may have asked you this question before, Doctor. Do you, in your opinion, feel that this condition is permanent as to the remainder of the 10% of unhealing to which you have previously testified?"

A. "I wouldn't be able to say."

In concluding that the evidence does not support a finding of permanent disability the circuit court was influenced by the passing observation in Parrott v. S. A. Healy Company, Ky., 290 S.W.2d 798, 800 (1956), that "generally speaking, only a physician qualified to express an opinion can establish evidence of a disability, its degree and its permanency." Out of context, this quotation does not represent an accurate statement of the law. See, for example, City of Olive Hill v. Parsons, 306 Ky. 83, 206 S.W.2d 41, 43 (1947), in which the point in question was discussed as follows:

"Appellant also raises a question concerning the extent and duration of ap-

pellee's disability. It suggests that the testimony of the employee without any medical evidence is not sufficient to support a finding of permanent disability. Disability is a question of fact to be determined by the Board, and we know of no rule which requires the employee to produce medical proof. Appellee himself testified at length with respect to his condition and his inability to obtain regular employment. He stated that since March 1943 he had worked about one-fourth of the time, and that was principally light work. There seems to be no question that he is suffering from a recurrence of the hernia, and is to some extent disabled. A review of all the evidence in the case convinces us that it was sufficient as a basis for the Board's finding of seventy-five percent partial permanent disability."

■ It is true of course that lay witnesses, including the claimant, cannot give opinion testimony, but it is not impossible for them to provide enough factual information for the board to draw valid conclusions with respect to the extent and duration of disability. "A claimant, like any lay witness, may not undertake to make a prognosis, but he may state facts concerning his condition and these facts may be of such a nature as to enable the Board to determine the extent and duration of the disability even in the absence of medical testimony." Yocum Creek Coal Co. v. Jones, 308 Ky. 335, 214 S.W.2d 410, 412 (1948), quoted with approval in Charles Seligman Distributing Co. v. Brown, Ky., 360 S.W.2d 509, 510 (1962).

■ Since Dr. Hubbard could not say whether the disability is permanent it may be that there was no substantial basis for the board's finding it so. But aside from the technical distinction, there is very little practical difference, as of the time it is made, between an award for permanent disability and an open-end award for temporary disability. We have no doubt that the evidence in this case supports the con-

clusions that Johnson was partially disabled at the time the question was taken under submission by the board and that the future duration of such disability was indefinite. Even if the award had been for an open-end temporary disability, payments would continue for the maximum period unless interrupted by a showing of change of condition, as in the instance of an award for permanent disability. Hence it is our opinion that a reversal of the board would not be warranted simply on the technical ground that it found the disability to be permanent. Nevertheless, upon remand of the proceeding, if the disability continues to exist, the award should be put on an open-end basis. Cf. Holland v. Childers Coal Company, Ky., 384 S.W.2d 293, 297 (1964).

The real trouble in the case grows out of the finding that Johnson's occupational disability amounts to 27%. The claim was filed after the effective date of Osborne v. Johnson, Ky., 432 S.W.2d 800 (1968), in which it was held that the percentage of partial disability should reflect the difference between prevailing wage rates in the kind of employment now and henceforth available to the claimant and the wage rates earnable by him before the injury. 432 S.W.2d at p. 803. Apparently the 27% figure was derived solely from the circumstance that Johnson was earning $138 per week at the time of the injury and is now earning only $100 per week, the difference being approximately 27%.

■ Skilton hired Johnson through a labor union. It paid him the union scale for a "skilled" laborer because he was expected to use a jackhammer whenever needed for that purpose. Under the circumstances we think the proof was adequate to establish his earning power at this level prior to the injury, but the bare fact that now he is driving for a transfer company and earning 27% less than before, without any evidence to indicate whether he is able to do some other available type of work that is more remunerative, is not enough to

justify a conclusion that his current earnings actually represent the best he can do. To illustrate the possibilities in this respect, though otherwse it might not be worth mentioning, Johnson admitted on cross-examination that he was so well satisfied with his present employment that he would not return to the construction job even if he were able. So it certainly is not a foregone conclusion that he is working for $100 per week only because it is the best he can do.

There having been some degree of uncertainty in adjusting to the new approach enunciated in Osborne v. Johnson, supra, it would be both appropriate and permissible for the board to entertain further evidence in this case. In any event, the proceeding must be remanded as directed by the circuit court for new findings.

The judgment is affirmed.

All concur.