**APPALACHIAN REGIONAL HOSPITALS, INC., Appellant,**

**v.**

**Lucinda BROWN, John W. Young, Commissioner, etc., et al., Appellees.**

Court of Appeals of Kentucky.

Feb. 12, 1971.

E. R. Hays, Baird & Hays, Pikeville, for appellant.

Hogg & Cornett, Whitesburg, for Lucinda Brown.

Martin Glazer, Thomas R. Emerson, Frankfort, for John W. Young, Commissioner of Industrial Relations, Custodian of the Special Fund.

NEIKIRK, Judge.

The Workmen's Compensation Board directed Appalachian Regional Hospitals, Inc., to compensate its employee, Lucinda Brown, for the total disability sustained by her as a result of a work-connected injury. The Special Fund was dismissed as a party-defendant to the proceedings by the Board. The award and the dismissal of the Special Fund as a party were affirmed by the Letcher Circuit Court. It is from this judgment that Appalachian Regional Hospitals, Inc., appeals. We affirm.

The issue of total disability is not before this court, as it is conceded that the employee is totally disabled and payments of compensation are now being made by the employer. An original plea of limitation by the appellant has been abandoned. The only question presented is whether or not the Board erred in dismissing the claim against the Special Fund, which ruling was sustained by the circuit court. The issue on appeal is between the employer and the Special Fund. The employer contends the award should be prorated between them. The Special Fund insists that the employee did not have a pre-existing dormant, nondisabling, disease condition aroused into disabling reality by a subsequent compensable injury within the meaning of KRS 342.120, and thus no part of the award should be paid by the Special Fund.

In the original hearing before the Board, the depositions of Dr. L. R. Miller and Dr. Harvey Chenault were taken. Their testimony was that the employee's disability was the result of a traumatic injury arousing a dormant, nondisabling, pre-existing congenital condition. Dr. Miller, an orthopedic surgeon, examined the employee. He stated:

"An x-ray examination was made of the lumbar spine which showed a spondylolisthesis at L5–S1, with bilateral defects in the pars interarticularsis of L5, and a forward slipping of L5 on the sacrum of approximately 25 percent of the diameter of the vertebra. This spondylolisthesis is in all likelihood congenital in nature and can be described as being a mechanical weakness which exists at that portion of the back, and one which, also, might be calculated to predispose to injury because of the existing weakness.

"By x-ray there was also noted a complete absence of the lamina of L5 on the left, suggesting that this had been removed surgically."

Dr. Miller explained that a person may have spondylolisthesis and never experience any discomfort. He was asked:

"Q 12 State, Doctor, in your opinion whether or not the plaintiff's present

condition occurred, or possibly occurred, as a result of the traumatic incidence.

"A It would be my opinion that spondylolisthesis, which I have attempted to describe, was probably congenital in nature, although it can also be described as dormant and non-disabling but capable of being aroused into disabling reality by reason of subsequent injury.

"Q 13 In your opinion did this type of incident happen to Lucinda Brown?

"A Yes, sir."

Dr. Miller concluded that 85% to 90% of the total and permanent disability of the employee is attributable to the arousal of the congenital, dormant, nondisabling condition pre-existing the traumatic incident and 10% to 15% to the injury and subsequent surgery.

Dr. Chenault, a neurological surgeon, also examined the employee. Part of his examination was devoted to interpreting the X-rays made by Dr. Miller. Dr. Chenault concluded that the disability of the employee was the result of arousal of spondylolisthesis into a disabling reality. He defined the pre-existing spondylolisthesis as being "a slippage of one vertebra on another—generally forward—and inherent in it is a defect of the body structure of the back which allows such an abnormal slippage." He stated that this is a congenital condition and that it is "most frequently or almost completely due to congenital defect of the bone." Dr. Chenault did not apportion the total disability suffered by the employee between the arousal of the pre-existing condition and the traumatic incident, but he did state that the disability was total and permanent.

After the testimony of Dr. Miller and Dr. Chenault, the Special Fund sought to be, and was made, a party-defendant to the proceedings. Dr. Robert F. Sexton was designated by the Board as an independent examining physician pursuant to KRS 342.121. Dr. Sexton examined the employee and filed his report. He stated in his report that he found no pre-existing condition and concluded that the employee had a 70% permanent disability to the body as a whole resulting from the traumatic injury. The report exonerated the Special Fund of any liability in this case. Exceptions to the report were filed by the appellant, because Dr. Sexton made no reference to an X-ray report by one Dr. Marshall, which noted the presence of spondylolisthesis and which it appears by the record was available to Dr. Sexton when he made his report. The Board passed the exceptions to the consideration of the case on its merits and found that the employee had no pre-existing condition that would require apportionment.

None of the medical testimony in this case classifies spondylolisthesis as a disease or describes its presence in a person as being a disease condition. The appellant, however, argues in effect that the meaning of the term "disease condition" as used in the statute is to be determined by *dictionary* definition; that one of the definitions in the dictionary is "any departure from the normal state of health"; that a congenital abnormality is such a departure; and that it is not necessary for a doctor, having found the presence of such an abnormality, to describe it as a "disease," since it is one by self-executing definition.

■ ■ We are willing to accept the proposition that the meaning of the term "disease condition" as used in the statute is to be determined by the courts and not by the medical profession, although we recognize that once the meaning of the term has been determined, the question of whether a particular condition comes within that meaning may depend on medical opinion. We do not, however, accept the broad definition of "any departure from the normal state of health." We think the term, as used by the legislature, is intended to have the meaning given it in common usage, which excludes con-

**326**

genital abnormalities and perhaps some other conditions of departure from the norm. Cf. Young v. Long, Ky., 463 S. W.2d 326, and Kentucky Convalescent Home v. Henry, Ky., 463 S.W.2d 328 (both cases this day decided).

Ordinarily the testimony of medical experts as to whether a particular condition is or is not a "disease condition" would be acceptable as determinative, because it would be assumable that the expert is speaking in terms of common usage, with which he should be most familiar. If, however, it appears that the expert in classifying a particular condition as a "disease condition" is employing a purely technical meaning not consistent with common usage, his classification will not be acceptable.

In the instant case, both under the doctors' understanding of common usage, as evidenced by their testimony, and under our own knowledge of common usage, the condition of having spondylolisthesis is not a "disease condition." Therefore, the Board properly determined that there was no basis for apportionment.

The judgment is affirmed.

All concur.