James R. YOCOM, Commissioner of Labor of the Commonwealth of Kentucky and Custodian of the Special Fund, Appellant,

v.

George T. JACKSON, Fayette County Board of Education and the Workmen's Compensation Board, Appellees.

FAYETTE COUNTY BOARD OF EDUCATION, Appellant,

v.

James R. YOCOM, Commissioner of Labor of the Commonwealth of Kentucky and Custodian of the Special Fund, George T. Jackson, and Workmen's Compensation Board, Appellees.

Court of Appeals of Kentucky.

Aug. 19, 1977.

Gemma Harding, Dept. of Labor, Louisville, Kenneth E. Hollis, Gen. Counsel, Dept. of Labor, Frankfort, for Special Fund.

Charles A. Taylor, Lexington, for George T. Jackson.

Leslie Rosenbaum, Lexington, for Fayette County Board of Education.

Before GANT, LESTER and PARK, Judges.

PARK, Judge.

These consolidated appeals arise out of a claim filed by George T. Jackson before the Kentucky Workmen's Compensation Board. Jackson was injured on February 19, 1974, in an automobile accident. The accident arose out of his employment as a messenger by the Fayette County Board of Education.

Jackson received a fractured sternum in the automobile accident, but his claim for compensation was based upon an alleged

psychiatric disability attributable to the automobile accident. The employer vigorously opposed any award of permanent partial disability benefits to Jackson. The employer also asserted that any award of permanent partial disability should be apportioned against the Special Fund inasmuch as Jackson received no permanent injury as a result of the fractured sternum.

In its award, the Workmen's Compensation Board found that Jackson was suffering from a twenty-five percent occupational disability as a result of the automobile accident. The Board also found that Jackson had no occupational disability prior to the accident and that there was no basis for Special Fund liability. On appeal from the award of the Board, the circuit court upheld the finding of occupational disability but held that the Board had erred in failing to apportion the award between the Special Fund and the employer. Two issues are presented by these consolidated appeals: (1) Did the Board apply the correct legal standard in holding that no liability should be assessed against the Special Fund? (2) Was the Board's award of twenty-five percent permanent occupational disability supported by the record?

## APPORTIONMENT ISSUE

The apportionment issue can best be understood by reference to the history of the efforts to balance the interests of the employer and the employee when the disability resulting from an industrial accident is much greater because of the employee's physical or mental health at the time of the accident. The early workmen's compensation statutes simply provided that there should be no recovery for "diseases" which were not the natural and direct result of a traumatic injury by accident. In the case of an employee who was suffering from a pre-existing neurosis which did not prevent his being able to work regularly prior to the compensable injury, the Board apportioned the resulting disability between the accident and the pre-existing neurosis. The employer was liable for only that portion of the disability attributable to the accident. The employee received no compensation for that portion of the disability which was attributed by the Board to the pre-existing neurosis. *Ashland Limestone Co. v. Wright,* 219 Ky. 691, 294 S.W. 159 (1927). As originally enacted, KRS 342.005 provided that the term "personal injury by accident" did not include "the results of a pre-existing disease." Thus the employee could receive no compensation for any disability to the extent that it was attributable to a pre-existing "disease."

The rule announced in the *Wright* case was substantially changed by the decisions of the Court of Appeals in *Highland Co. v. Goben,* 295 Ky. 803, 175 S.W.2d 124 (1943), and *Wood-Mosiac Co. v. Shumate,* 305 Ky. 368, 204 S.W.2d 331 (1947). When a disability was attributable in part to injury and in part to a pre-existing disease, apportionment was required by KRS 342.005 only if the disease itself was active and disabling prior to the traumatic injury. The court held that the employer was responsible for the entire disability if the pre-existing disease was dormant and nondisabling prior to the injury.

This rule was short-lived. In 1948, KRS 342.005 was amended to provide that "personal injury by accident" did not include the "results of a pre-existing disease, *whether previously disabling or not.*"[1] This amendment restored the rule laid down in the *Wright* case. A pre-existing neurosis was deemed a disease, and the Board was required to apportion disability between the pre-existing neurosis and the traumatic injury. *Old King Mining Co. v. Mullins,* Ky., 252 S.W.2d 871 (1952).

Under KRS 342.005 as construed in the *Mullins* case, the employee received no compensation for that portion of his disability attributable to a pre-existing disease. In 1946, the Subsequent Injury Fund was created to assist employees who suffered a greater degree of disability following a compensable injury because of the presence of a pre-existing "permanent partial dis-

---

1. 1948 Ky. Acts, Chap. 65, § 1 (KRS 342.005).

ability."[2] The employer was liable only for the degree of disability which would have resulted from the subsequent injury had there been no pre-existing disability. The employee, of course, received no compensation for the pre-existing disability. However, the Subsequent Injury Fund compensated the employee for the additional disability attributable to the combination of the pre-existing disability and the subsequent injury. The liability of the Subsequent Injury Fund was very limited. It had no liability for a pre-existing disability attributable to disease unless the disease was a natural and direct result of a compensable injury. The Subsequent Injury Fund was intended to encourage employers to hire handicapped workers. If an employer hired a handicapped worker, his liability under the workmen's compensation law for a subsequent injury to the employee would be no greater, in theory, than his liability for the same injury to a healthy employee. At the same time, the handicapped employee would be protected against the greater degree of disability which might result because of his pre-existing handicap. 2 *Larson's Workmen's Compensation Law* § 59.31 (1976).

Despite the original purpose of the Subsequent Injury Fund, the legislature in 1960 extended the liability of the fund (re-named the Subsequent Claim Fund) to a pre-existing "dormant nondisabling disease condition which was aroused or brought into disability reality" as a result of a subsequent injury.[3] The board was directed to apportion disability among the contributing causes, including a "pre-existing disease not previously disabling but aroused into disabling reality" by the subsequent injury. Employers very quickly sought to impose liability on the Subsequent Claim Fund (re-named the Special Fund in 1964) for a variety of pre-existing physical and mental characteristics of injured employees.

In a long line of cases following the 1960 amendments to the workmen's compensa-

tion law, the former Court of Appeals was required to consider whether an employee was suffering from a dormant emotional or mental "disease condition" which was aroused into disabling reality by the subsequent injury.[4] In *Young v. Bear Branch Coal Co.*, Ky., 434 S.W.2d 656 (1968), the court emphasized that the statute required the existence of a dormant "disease condition" not merely a "condition" before liability could be imposed upon the Special Fund. The court stated:

> "We think the medical evidence established that the employee had a dormant nondisabling emotional or mental condition which was brought into disabling reality by his physical injury. This conclusion, however, does not resolve the basic question in the case. That question is whether the employee's psychiatric situation existing prior to the injury was a '*disease condition*'. (Emphasis added)

> \* \* \* \* \* \*

> "While under subsection (1)(a) of KRS 342.120 a pre-existing disabling condition may require apportionment regardless of its nature, under subsection (1)(b) of that statute (here applicable) a nondisabling condition must fall within the classification of a 'disease'. (The form letter which the Board directs to a physician appointed under KRS 342.121 is inaccurate and may contribute to an unsatisfactory report in that it refers to a 'nondisabling disease or other condition', whereas, the statute (KRS 342.120(1)(b)) does not recognize such an alternative other condition.)" 434 S.W.2d at 658

If the employee were suffering from a pre-existing nondisabling neurosis which became disabling following a subsequent injury, then liability could be imposed upon the Special Fund. Based upon the holdings in the *Wright* and *Mullins* cases, the pre-existing neurosis was considered a disease. *Ricky Coal v. Adams*, Ky., 426 S.W.2d 464 (1968). On the other hand, if the employe

---

2. 1946 Ky. Acts, Chap. 23, § 1.

3. 1960 Ky. Acts, Chap. 147, § 9 (KRS 342.-120(1)(b)).

4. 1960 Ky. Acts, Chap. 147, § 1 (KRS 342.-005(2)(c)).

had only "a low threshold emotional breaking point" which constituted a "personality defect," this was considered to be a "condition" but not a "disease condition" for which liability could be imposed upon the Special Fund. *Yocom v. Tri-County Sanitation Service*, Ky., 522 S.W.2d 850 (1975); *City of Pikeville v. Maynard*, 428 S.W.2d 202 (1968); *Cabe v. Olin Mathieson Chemical Corp.*, Ky., 412 S.W.2d 250 (1967); *Holland v. Childers Coal Co.*, Ky., 384 S.W.2d 293 (1964).

In 1972, substantial amendments were made to the workman's compensation law which affected the liability of the Special Fund. KRS 342.005 had required the Board to apportion disability among the contributing causes including "pre-existing disease not previously disabling." This statute was repealed.[5] Most important, KRS 342.120 was amended to provide that the Special Fund was liable for a dormant nondisabling "disease or condition" which was aroused or brought into disabling reality by a subsequent injury.[6]

▇ Although recognizing that the Special Fund could be liable for a pre-existing condition which did not constitute a pre-existing disease, the Board in this case relied on the distinction previously made in the *Maynard, Ricky Coal,* and *Holland* cases between a neurosis and a personality disorder. In the absence of active disability prior to the subsequent injury, the Board held that liability could be apportioned to the Special Fund only if the employee was suffering from a pre-existing neurosis. We agree with the circuit court that the Board erred in holding that the 1972 amendments worked no change in the liability of the Special Fund in the case of employees having a pre-existing personality defect which contributed to the employee's disability following an industrial accident. In *Yocom v. Pierce*, Ky., 534 S.W.2d 796 (1976), decided shortly after the award by the Board, the Supreme Court held that the Special Fund could be liable for a pre-existing dormant nondisabling personality condition which

contributed to the employee's subsequent work related nervous breakdown. The employee had a pre-existing anxiety neurosis which had increased over a period of years, but it is not clear from the opinion whether all of the pre-existing neurosis was work related. In answer to the employer's argument that the employee's personality make-up or structure did not constitute a condition, the court specifically held:

> There is no room for doubt that the statute now refers to a condition separate and apart from a disease.

The difficult problem is determining what type of personality characteristic constitutes a "condition" within the meaning of KRS 342.120.

In construing the 1972 amendments in *Yocom v. Gibbs*, Ky., 525 S.W.2d 744 (1975), the court stated:

> Prior to the amendment, this court read the words "disease condition" to mean a condition caused by disease. It also construed this statutory term "disease" to have been used in its ordinary and usual meaning rather than in a technical and scientific sense. * * *

The court reasoned in these cases that subsequent injury claim funds existed primarily for the encouragement of employment of obviously handicapped workers and the concept of allowing the employer to pass off partial responsibility to a fund composed of the contributions of all employers where the obviously handicapped worker suffered a work-connected injury was sufficiently strained by the imposition of partial responsibility on the pool fund for arousal of dormant "diseases" that it must have been the intent of the legislature not to further expand the right of the employer to pass off his liability where the injured worker's condition was a mere unobservable deviation from the norm, or was a natural aging process. In such instances, the worker was not penalized because the employer was responsible for the entire award. 525 S.W.2d at 745–46

---

**5.** 1972 Ky. Acts, Chap. 78, § 36.

**6.** 1972 Ky. Acts, Chap. 78, § 17.

The court then went on to hold that the 1972 amendments were intended by the legislature to reverse the results in such cases as *Young v. City Bus Co.,* Ky., 450 S.W.2d 510 (1969) and *Appalachian Regional Hospitals v. Brown,* Ky., 463 S.W.2d 323 (1971). It should be noted that the *City Bus Co.* case was based upon *Young v. Bear Branch Coal Co., supra.*

In the *Brown* case, the court rejected a broad definition of the term "disease" which would have encompassed "any departure from the normal state of health." 463 S.W.2d at 325. In light of the holding in *Yocom v. Gibbs, supra,* that the 1972 amendments were intended to reverse the result in the *Brown* case, this court concludes that a dormant nondisabling condition within the scope of KRS 342.120 must be a condition which constitutes a "departure from the normal state of health." Only a "dormant nondisabling" physical or mental abnormality could be "aroused * * * into disabling reality."

Often, an employee's disability resulting from an industrial injury would have been less "but for" pre-existing mental or physical characteristics of the employee. For example, the degree of occupational disability resulting from an injury to an employee's left hand will depend upon a pre-existing physical characteristic, namely, whether the employee is left handed or right handed. It is clear that the term "condition" in KRS 342.120 is not used in the "but for" sense. In *Kentucky Convalescent Home v. Henry,* Ky., 463 S.W.2d 328 (1971), the court held that obesity was not a disease within the meaning of KRS 342.120. The court stated:

It is difficult to imagine how a determined amount of fat can be "aroused" or "brought into disabling reality." If we proceed from the premise that obesity is the quality or state of being very fat or corpulent, and since the evidence established that the employee's obesity was in the same state after the injury as it was

before the injury, then we must conclude that despite the injury the same amount of the inert substance called fat existed after the injury as was present before. Common human experience demonstrates that the presence of fat can and does accentuate the consequences of injury in given situations, but the same experience also establishes that the same accentuation of ordinarily expectable consequences of injury may be caused by general bone structure or body frame or stature. 463 S.W.2d at 330

Thus, a dormant nondisabling condition within the meaning of the statute is a departure from the normal state of health which is itself capable of being aroused into disabling reality.

However, not every departure from the normal state of health constitutes a dormant condition within the meaning of the statute. Considering the purpose of funds such as the Special Fund, this court concludes that it must be reasonably foreseeable that the abnormality may become disabling to some degree as a result of the ordinary stresses of everyday life over the employee's expected work life before it can be considered a dormant condition within the meaning of KRS 342.120. The circuit court was correct in holding that the Board applied the wrong standard in finding that there was no basis for a liability of the Special Fund. The Board must make a new determination of the question of the Special Fund's liability for any permanent disability in accordance with the standards set forth in this opinion.

At the present time the operation of the Special Fund depends upon special assessments made against all workmen's compensation insurance carriers and self-insured employers.[7] The liabilities of the Special Fund are, in reality, the liabilities of Kentucky business and industry in general. We believe that the legislature intended to encourage the employment of persons having health problems which could affect the

7. M. Glazer, "Changes in the Law Regarding Special Fund," *Seminar on Workmen's Compensation,* Office of Continuing Legal Education, University of Kentucky College of Law (1974), 82 at 107–08.

degree of disability in the event of subsequent injury. It was not the intention of the legislature to relieve employers from the natural consequences of their employees' work related injuries merely because the degree of disability was affected by some physical or mental characteristic which ordinarily would never have affected the employees' ability to work.

## PERMANENT DISABILITY ISSUE

■ The Board made an award of permanent partial disability benefits based upon a finding of twenty-five percent occupational disability attributable to the automobile accident. The circuit court was of the opinion that there was evidence of probative value in the record which would support the Board's award. Without agreeing or disagreeing with this ruling of the circuit court, this court concludes that there are not sufficient findings of fact by the Board to afford meaningful review.

The employer contends that Jackson is an habitually untruthful person who presented false testimony in the furtherance of a fraudulent scheme to obtain workmen's compensation benefits in this case. The employer asserts that the medical testimony cited by the Board in support of its award was based either upon an inadequate or false history. In arguing that there was not sufficient evidence of probative value to support the award, the employer relies upon the decision in *Smyzer v. B. F. Goodrich Chemical Co.,* Ky., 474 S.W.2d 367 (1971).

The employer offered substantial testimony from numerous witnesses in support of its contention that Jackson suffered from no permanent disability as a result of the automobile accident. If this court had been the trier of fact, Jackson would not have received the award of permanent partial disability made by the Board. However, this court is not the trier of fact. It reviews the award of the Board solely for the purpose of determining whether it is supported by evidence of probative value. Nevertheless, if there is to be meaningful review by this court of the award of the Board, there must be findings of fact by the Board on the issues raised by the evidence.

In the present case, most of the opinion relating to the medical testimony is no more than a recital of the testimony. For review purposes, this court does not need a recitation of the evidence; we need to know what facts the Board found from that evidence. This is particularly true in this case. We find no medical evidence in the record that Jackson has any *permanent* disability. The Board relied most heavily on the testimony of Dr. Ables, the treating psychiatrist. In the opinion of Dr. Ables, Jackson's condition would be considered chronic only if his symptoms continued another six months to a year. We are left to guess at the basis of the Board's finding of permanent partial disability.

Furthermore, the Board's opinion does not specify the nature of Jackson's psychiatric condition. As a "finding of fact," the Board stated:

> "We have written before that we welcome plain language and Dr. Ables said three times on the same page that something is wrong with his head. We agree and we believe the 'something' is compensable and causally related to the accident on February 19, 1974."

It is impossible to afford appellate review of the award without a specific finding on the nature of Jackson's condition. In *Ricky Coal Company v. Adams, supra,* the court quoted Larson for the proposition that, "There is almost no limit to the variety of disabling 'psychic' conditions that have already been recognized as legitimately compensable." 426 S.W.2d at 466. However, not every psychic condition is disabling, and no condition is compensable unless it is disabling. The fact that Jackson has a "personality disorder" or suffers from an "immaturity reaction" does not establish a compensable injury. Even if Jackson is suffering from a neurosis as a direct result of the injury, the Board's findings should establish that the neurosis results in a functional disorder that is disabling. There is no evidence in the record that Jackson is suffering from a psychosis, which by definition would be disabling.

The Board's opinion makes almost no mention of the extensive testimony by the nonmedical witnesses offered by the employer. There are no specific findings relating to the factual issues raised by those witnesses. We do not know whether the Board found that the employer's witnesses were entitled to no credibility. We do not know whether the Board believed that Jackson was truthful in all matters. There is no specific finding with respect to Jackson's mental condition prior to the automobile accident. There are no findings as to his work history or prior injury claims.

In many cases, detailed findings of fact are not necessary. However, considering the subjective nature of this claim and the serious challenge made to Jackson's credibility, specific findings of fact are needed if meaningful review is to be afforded by this court. The monetary value of the Board's award to Jackson is substantial. In fairness to the employer, this court should not have to guess at what facts were found by the Board. The circuit court erred in not remanding the case to the Board for more specific findings.

### RULING

The judgment in No. CA–154–MR is affirmed. The judgment in No. CA–174–MR is reversed. The circuit court shall enter a new judgment remanding the case to the Board with directions to make new findings of fact and conclusions of law in accordance with this opinion.

All concur.