**Vicki G. NEWBERG, Acting Director of Special Fund, Appellant,**

**v.**

**ARMOUR FOOD COMPANY; Neill Travelstead; Walter W. Turner, Administrative Law Judge; and Workers' Compensation Board, Appellees.**

**No. 92–SC–62–WC.**

Supreme Court of Kentucky.

June 25, 1992.

As Corrected Sept. 1, 1992.

Rehearing Denied Sept. 16, 1992.

Mark C. Webster, Labor Cabinet—Special Fund, Louisville, for appellant.

Allan Weiss, Louisville, for appellee Armour Food Co.

R. Michael Kelly, Louisville, for appellee Travelstead.

## OPINION OF THE COURT

This case concerns whether or not liability for the award of compensation benefits should have been apportioned between the employer and the Special Fund. The claimant herein was employed by Armour Food Company (Armour) on August 12, 1988. There was testimony that he had undergone a pre-employment physical which included what appeared to be electrical tests for the presence of carpal tunnel syndrome. After a few days on the job, claimant was assigned the task of cutting meat and bones with a vibrating, electric wizard knife. Within four or five days claimant began to experience a tingling sensation, and eventually he experienced pain, numbness, and swelling in his hands and wrists which became worse at night. On September 23, 1988, six weeks after his employment, claimant reported his discomfort to his employer's medical department. He was referred to Dr. Kincaid, a specialist in hand surgery, who examined him shortly thereafter, and who made a clinical diagnosis of early bilateral carpal tunnel syndrome (CTS). Dr. Kincaid initiated conservative treatment with anti-inflammatory medication and referred claimant to Dr. Thurman, a rehabilitation specialist. Dr. Thurman examined claimant on September 27, 1988, and confirmed the clinical diagnosis with electromyographic (EMG) studies.

After following claimant's condition for approximately two months, Dr. Kincaid recommended that, while claimant's condition was somewhat improved, he should consider seeking other employment to avoid continued problems with his hands. On February 14, 1989, Dr. Thurman repeated the EMG studies and noted that the abnormalities had partially resolved. A follow-up EMG was performed on August 28, 1989, and indicated that all abnormalities shown in the prior examinations had resolved. Dr. Thurman believed there was no permanent impairment, as did Dr. Kincaid.

Because claimant claimed to have experienced no prior problems with his hands, Dr. Thurman considered it unusual for him to have developed CTS so quickly after his employment with Armour. Dr. Thurman testified that it ordinarily requires no less than three weeks between trauma and EMG testing for abnormalities to be evident. If such abnormalities appeared in testing performed less than three weeks post trauma, they would indicate that some problem existed prior to the trauma or that the subject had a predisposition to developing carpal tunnel syndrome. When asked if such a predisposition would constitute a deviation from the normal state of health, Dr. Thurman stated his opinion that, in claimant's case, any predisposition was based on the anatomical configuration of his wrist and noted that different people have different predispositions for developing CTS. He did not state that claimant's wrist configuration or any predisposition he might have would be considered a departure from the normal state of health. Dr. Thurman also testified that someone with a propensity to develop CTS would do so only if their hands were used in a way that involved repeated trauma such as was required by claimant's employment. We note, at this point, that, although claimant experienced symptoms within several days of beginning to use the wizard knife, the EMG studies were not performed until over five weeks after he first used the knife.

Dr. Goddy, an orthopedic surgeon, saw claimant several times and ordered a consultation with a rheumatologist to determine if there were other factors contributing to claimant's symptoms. The conclusion was that there was no underlying collagen disease or rheumatoid arthritis. In March, 1989, Dr. Goddy noted that claimant's condition was much improved. A report prepared in mid-July indicated that, as of the March visit, Dr. Goddy would assess a 9% functional impairment; however, when informed at his September 20, 1989, deposition about the latest EMG studies, Dr. Goddy testified that the current disability figure should then be no more than half of the 9% figure, perhaps even less. He testified that he had seen claimant after filing the report, that his symptoms had improved since March, and that continued improvement could be expected. He described claimant's condition as a "long term, temporary disability problem," and stated his belief that there was probably no permanent change. Claimant was advised to avoid repetitive movements with his hands and wrists to prevent future symptoms. Dr. Goddy also testified that it is uncommon for someone to develop symptoms of carpal tunnel syndrome in such a short time as claimant did. When this happens, there is usually an underlying problem such as a collagen disease or rheumatic-like disease. Although he testified that there was no evidence of any such disease in this case and no objective proof of any other abnormality, such as in the basic anatomy of claimant's wrist, Dr. Goddy believed that some such underlying problem must have caused claimant to become symptomatic so soon after his employment with Armour.

Dr. Banerjee, a neurosurgeon, examined claimant on August 8, 1989, and reviewed the tests and reports made up to that time. This did not, of course, include the results of the EMG performed on August 28. His report indicates that he assessed a 2% functional impairment, "to give him the benefit of the doubt." In response to a written request to describe the nature of any dormant, nondisabling disease or condition capable of being aroused, Dr. Banerjee responded "thick handshort-typed ½ hour or so daily for 7 years 1%."

Claimant testified that he had experienced no problems with his hands before his employment with Armour. He asserted that he continued to experience chronic pain in his hands, and that it was aggravated by even minimal efforts to use them.

The Administrative Law Judge (ALJ) awarded claimant a 15% occupational disability on the basis of testimony of functional impairment by Drs. Goddy and Banerjee. He also ruled that, while the medical evidence indicated that claimant had a predisposition to develop CTS with repetitive use of his hands, the evidence did not convince him that claimant's predisposition amounted to an abnormality that was aroused into disabling reality. Liability for the entire award, therefore, fell to Armour.

Armour appealed, asserting that claimant's predisposition was a dormant, nondisabling condition under KRS 342.120(2)(b) and that apportionment with the Special Fund was required. Armour also asserted that, contrary to the ALJ's conclusion, the claimant had suffered no permanent, harmful, physical change and no occupational disability. The Workers' Compensation Board (Board) ruled that there was substantial evidence to support the award of benefits. The Board reversed on the issue of apportionment, stating that the ALJ's findings and conclusions on that issue were inconsistent "within themselves." While it had not been objectively demonstrated, testimony that claimant had a narrow carpal canal was without contradiction. The narrow carpal canal caused claimant's median nerve to become inflamed when he made rapid, repetitive, wrist and hand movements, producing CTS. The Board equated the predisposition caused by claimant's narrow carpal canal to an arthritic condition which was dormant, but aroused into symptomatic reality by work, then ruled that "[a]n anatomical narrowing of the carpal canal is a departure from the normal state of health, and with rapid, repetitive, wrist and hand movements is aroused into disabling reality." Thus, an apportionment with the Special Fund was compelled. The

Court of Appeals affirmed on the issue of apportionment. The issue of occupational disability was apparently not appealed.

 The critical issue is to determine under what circumstances a predisposition to a particular type of injury constitutes a dormant, nondisabling condition which was aroused into disabling reality by work. KRS 342.120(2)(b). *Taber's Cyclopedic Medical Dictionary*, 15th Edition, defines the word predisposition as "[t]he potential to develop a certain disease or condition in the presence of specific environmental stimuli." As this Court has interpreted KRS 342.120(2)(b), a dormant, nondisabling condition must constitute a departure from the normal state of health. *Yocom v. Jackson*, Ky., 554 S.W.2d 891 (1977). Because, as used by the medical profession, "predisposition" would encompass a potential created by virtually any human characteristic, regardless of whether or not that characteristic was a departure from the normal state of health, we are unwilling to say that a predisposition, in and of itself, constitutes a dormant, nondisabling condition for the purposes of KRS 342.120(2)(b). Where there is evidence of such a predisposition, we believe that it is more appropriate to consider the underlying medical condition which caused the predisposition to determine whether or not that condition was a departure from the normal state of health, and whether it was aroused into disabling reality by the work-related injury.

In this case, the ALJ ruled only that claimant had a predisposition to CTS. The condition which the medical experts believed had caused claimant to be unusually susceptible to CTS was the anatomy of his wrists. They believed he probably had narrow carpal canals, essentially because there was no evidence of any other cause. Unlike an arthritic condition which may be present, though asymptomatic, for a period of time and then become symptomatic after an injury, there was no evidence that claimant's wrist conformation involved any tissue degeneration or pathology. The evidence was that the conformation of claimant's wrists, including his carpal canals, has remained unchanged throughout.

While there was medical testimony that his carpal canals were probably narrow, Dr. Thurman, the only physician specifically asked, did not testify that this condition was a departure from the normal state of health. There was no medical evidence that the dimension of claimant's carpal tunnels, while narrow, was outside the normal range. Furthermore, there was no evidence that this particular wrist conformation would, of its own natural course, result in any permanent, functional impairment. Unlike certain other congenital anatomical conditions, there was no evidence that claimant's narrow carpal tunnels caused a physiological weakness in the structure of his wrists.

The evidence was that unless claimant had engaged in activities requiring the repetition of rapid, alternating, wrist motions or rapid, extreme flexion and extension, he probably would not have experienced the problems he did. Medical evidence indicated that it was the extreme frequency of the particular motions required by claimant's work that was the source of the problem. The occasional use of such motions would likely have caused no problem.

Under these circumstances, we do not believe that the ALJ erred in ruling that, while claimant had a predisposition to CTS, such a predisposition did not constitute a dormant, nondisabling condition for the purposes of KRS 342.120(2)(b). His ruling was supported by substantial evidence, was not unreasonable, and should not have been disturbed on appeal. *Special Fund v. Francis*, Ky., 708 S.W.2d 641 (1986). Accordingly, the decision of the Court of Appeals is hereby reversed, and the decision of the Administrative Law Judge is reinstated.

STEPHENS, C.J., and LEIBSON, REYNOLDS, SPAIN and WINTERSHEIMER, JJ., concur.

LAMBERT, J., dissents by separate opinion in which COMBS, J., concurs.

LAMBERT, Justice, dissenting.

I dissent from the majority opinion and would affirm the Court of Appeals. Writ-

ing for the Workers' Compensation Board, Board Member Miller precisely analyzed this case and I adopt his views:

"The ALJ's finding and conclusion are inconsistent within themselves. To conclude that a predisposition does not equate with an abnormality is merely bandying with semantics, i.e., a difference without a distinction. Here, the ALJ found that uniformly the medical evidence was to the effect that Travelstead had a predisposition to carpal tunnel syndrome. While it could not be objectively demonstrated, without contradiction, the medical testimony was that Travelstead had a narrowed carpal canal as a result of which the median nerve became inflamed with rapid repetitive hand and wrist movements producing carpal tunnel syndrome. Uncontradicted medical evidence cannot be ignored without explanation. *Commonwealth v. Workers' Compensation Board of Kentucky*, Ky.App., 697 S.W.2d 540 (1985). We see no difference between this condition and an arthritic condition which was quiescent but activated into symptomatic reality by a work-related incident. While it is a psychiatric case, *Yocum [Yocom] v. Jackson*, Ky.App., 554 S.W.2d 891 (1977) is helpful by way of defining dormant non-disabling disease condition as follows: 'Thus, a dormant nondisabling condition within the meaning of the statute is a departure from the normal state of health which is itself capable of being aroused into disabling reality.'"

COMBS, J., joins in this dissenting opinion.