Vicki G. NEWBERG, Acting Director
of Special Fund, Appellant

v.

Ruth SLEETS; Treyton Oak Towers;
Roger D. Riggs, Administrative Law
Judge; and Workers' Compensation
Board, Appellees.

TREYTON OAK TOWERS,
Cross–Appellant

v.

Vicki G. NEWBERG, Acting Director of
Special Fund; Ruth Sleets; Roger D.
Riggs; and Workers' Compensation
Board, Cross–Appellees.

Nos. 93–CA–2527–WC, 93–CA–2351–WC.

Court of Appeals of Kentucky.

Feb. 10, 1995.

Motion to Publish Granted,
Rehearing Denied April 28, 1995.

Joel D. Zakem, Labor Cabinet, Louisville,
for Vicki G. Newberg.

Wayne C. Daub, Louisville, for Ruth
Sleets.

R. Scott Summers, Williams & Wagoner,
Louisville, for Treyton Oak.

Before LESTER, C.J., and DYCHE and
HOWERTON, JJ.

*OPINION*

HOWERTON, Judge.

The Special Fund and the employer, Treyton Oak Towers, each petition this Court for review of the opinion of the Workers' Compensation Board (Board) dated September 3, 1993, affirming the Administrative Law Judge's (ALJ) order wherein Ruth Sleets was found to be 100 percent occupationally disabled due to carpal tunnel syndrome (CTS)/tendinitis, with liability apportioned equally between the Special Fund and Treyton Oak Towers. The Special Fund raises the sole issue of apportionment of liability, while the employer raises issues of notice,

causation, and extent of disability. With regard to those issues raised by the employer, we affirm. However, we are compelled to reverse the decision concerning Special Fund liability, as there is no proof that any preexisting condition in Ruth's elbow, shoulder, or hand was anything but normal. *Newberg v. Armour Food Co.*, Ky., 834 S.W.2d 172 (1992).

Ruth Sleets was employed by Treyton Oak Towers as a nurse's aide or nursing assistant. Her job duties involved basic hands-on care of the patients, including but not limited to assisting in showers, personal hygiene, lifting, and taking vital signs. On October 12, 1990, Ruth reported an injury to her supervisor involving her right arm which had become very swollen and hot to the touch. Her supervisor immediately took her to be examined by a Dr. Amin who diagnosed tendinitis of the elbow cap and prescribed medication. Ruth got no relief from Dr. Amin's treatment, so he referred her to Dr. Ghazi who also diagnosed tendinitis. He saw her on two separate occasions in November 1990 and on one occasion gave her an injection which afforded her some temporary relief. Ruth received a subsequent referral by Dr. Amin to see Dr. Tsai.

Ruth first saw Dr. Tsai on January 29, 1991, at which time she complained of pain in the right upper extremity. During that initial visit, Dr. Tsai diagnosed lateral epicondylitis with possible radial tunnel compression. In her next visit, Dr. Tsai added pronator and carpal tunnel compression to the diagnosis. In March 1991, Dr. Tsai performed surgery involving carpal tunnel and pronator release, tennis elbow release, and radial tunnel release which resulted in improvement of Ruth's condition. However, by late May 1991, Ruth had developed cubital tunnel compression to the ulnar nerve which was initially treated conservatively with a brace and medication but ultimately required surgery in August 1991. Ruth subsequently developed symptoms of thoracic outlet compression and scapulofasciitis. She was last seen by Dr. Tsai on December 26, 1991. Dr. Tsai released her to return to light to medium work duty with lifting restrictions of no more than 50 pounds, or no more than 25 pounds frequently for at least one year. It

was his opinion that Ruth might not be able to resume her duties as a nursing assistant if such required lifting patients.

Dr. Tsai was further of the opinion that Ruth's condition was not caused solely by her work. Rather, he attributed 50 percent of the cause to work and 50 percent to an underlying disease process. According to Dr. Tsai, Ruth was predisposed to suffer from this condition due, in part, to her age and gender (related to hormonal changes).

Dr. Timir Banerjee saw Ruth at the instance of the Special Fund. Based upon her medical history and his examination, he concluded that she had a total permanent impairment of nine percent, three percent of which he attributed to her actual injury, with the remaining six percent attributable to multiple operation syndrome. Dr. Banerjee also had difficulty in causally relating CTS to her described injury. However, he believed a diagnosis of tendinitis would be consistent with pulling/lifting a patient.

Ruth was also examined by Dr. Thomas Harter at the request of Treyton Oak. He did not find her symptoms consistent with CTS. He further stated that while he did not believe her to have medical impairment of function, she could have an occupational impairment based upon all of the surgeries she had undergone.

The ALJ placed great significance and weight upon the testimony of Dr. Tsai in finding Ruth 100 percent occupationally disabled and in determining apportionment of liability between the Fund and Treyton Oak. The Board affirmed the award, opining that the ALJ's findings and conclusions were based upon substantial evidence.

■ The Special Fund claims that it should not be subject to any liability in this particular case. It alleges that the claimant failed in her burden of proof by offering no evidence that her disability was caused in part by a preexisting condition constituting a departure from the normal state of health. We must agree in light of *Yocom v. Jackson*, Ky.App., 554 S.W.2d 891 (1977), and *Armour Food Co., supra.*

Because the ALJ found that Ruth successfully met her burden of proof on the issue of

the Special Fund's liability, our only concern in reviewing this matter is whether the order of the ALJ is supported by substantial evidence. *Kentland Elkhorn Coal Co. v. Johnson*, Ky.App., 549 S.W.2d 308 (1977). Evidence sufficient to find a dormant, nondisabling condition justifying apportionment of liability to the Special Fund has been defined in detail in *Armour Food Co., supra*, at 175. There the Kentucky Supreme Court held as follows, to-wit:

> The critical issue is to determine under what circumstances a predisposition to a particular type of injury constitutes a dormant, nondisabling condition which was aroused into disabling reality by work.... As this Court has interpreted KRS 342.120(2)(b), a dormant, nondisabling condition must constitute a departure from the normal state of health. *Yocom v. Jackson*, Ky., 554 S.W.2d 891 (1977).... [W]e are unwilling to say that a predisposition, in and of itself, constitutes a dormant, nondisabling condition for the purposes of KRS 342.120(2)(b).... [W]e believe that it is more appropriate to consider the underlying medical condition which caused the predisposition to determine whether or not that condition was a departure from the normal state of health, and whether it was aroused into disabling reality by the work-related injury.

We have reviewed the medical testimony proffered in this matter which was before the ALJ and the Board for consideration. While the medical experts do not agree as to whether Ruth suffered from CTS or tendinitis, in either case the medical evidence is devoid of any objective findings to establish, under *Armour*, that Ruth suffered from a preexisting condition. As was the case with the claimant in *Armour*, there was competent medical testimony (from Dr. Tsai) in the form of an opinion that Ruth must be suffering from narrowing of the tunnels (although no objective findings support this) which, when accompanied by repetitive, prolonged motion, caused the predisposition to suffer from CTS to become aroused into disabling reality. Dr. Tsai opined that many factors could cause Ruth to be so predisposed to such a condition, including her age and her gender. However, again as in *Armour*, none

of the medical experts, including Dr. Tsai, ever testified that the purported narrow tunnels in Ruth's wrist which predisposed her to suffer CTS constituted a departure from the normal state of health. Thus, while Ruth proved to the satisfaction of the ALJ and the Board a predisposition to CTS, such predisposition did not constitute a dormant, nondisabling condition for the purposes of KRS 342.120(2)(b) simply because there was *no* evidence that this predisposition was a departure from the normal state of health.

■ Treyton Oak seeks review of the decisions concerning notice of injury, claiming Ruth failed to give it notice of her injury "as soon as practicable." KRS 342.185 provides, "No proceeding under this chapter for compensation for an injury ... shall be maintained unless a notice of the accident shall have been given to the employer as soon as practicable after the happening thereof...." "Whether notice has been given as 'soon as practicable' depends upon all the circumstances of the particular case." *Marc Blackburn Brick Co. v. Yates*, Ky., 424 S.W.2d 814, 816 (1968). Further, KRS 342.200 affords claimants some degree of liberty in fulfilling the notice requirement "to effectuate the beneficent purposes of the Compensation Act." 424 S.W.2d at 816. KRS 342.200 states:

> The notice shall not be invalid or insufficient because of any inaccuracy in complying with KRS 342.190 unless it is shown that the employer was in fact misled to his injury thereby. Want of notice or delay in giving notice shall not be a bar to proceedings under this chapter if it is shown that the employer, his agent or representative had knowledge of the injury or that the delay or failure to give notice was occasioned by mistake or other reasonable cause.

We find a statement of the *Blackburn* court to be particularly significant and applicable to the case *sub judice*. "The nature of the injury is important on the question of notice insofar as it relates to the knowledge of the injured person of the extent of his injury." *Id.* at 816. Thus Kentucky's high-

est court has found notice to be adequate and timely given, even though it occurs several months after the actual date of the accident. *See Reliance Diecasting Co. v. Freeman,* Ky., 471 S.W.2d 311 (1971); and *Rowe v. Semet–Solvay Div. Allied Chem. & Dye Corp.,* Ky., 268 S.W.2d 416 (1954).

In the instant case, Treyton Oak had *actual* knowledge of Ruth's injury on October 12, 1990, when she reported the condition of her right arm to her supervisor and was taken to Dr. Amin for examination. However, it would appear from the record that the full extent of her injury was not appreciated, nor was the causal connection understood, until Ruth saw Dr. Tsai on January 29, 1991. By February 27, 1991, her condition had progressed to the point that she was no longer able to work. Her attorney formally notified Treyton Oak as soon as practicable after learning of the diagnosis and relationship to Ruth's work. Accordingly, we find that there was substantial evidence to support this finding and therefore affirm on the issue of notice.

■ Treyton Oak also questions the propriety of the ALJ's finding that Ruth's injury was work-related. Again, the question which this Court must address on review is whether there was substantial evidence to support such finding. Dr. Tsai found Ruth's work to be 50 percent of the cause of her physical problems. We know of no reason to question the competency of Dr. Tsai or his opinion. It is of no regard that there may have been differing opinions. The trier of fact is the sole judge of weight and credibility of the evidence before it. The ALJ placed great reliance upon Dr. Tsai's testimony and we cannot say that such reliance was ill-founded. We, therefore, affirm the decision with regard to causation.

■ Finally, Treyton Oak challenges the ruling as to the extent of Ruth's disability. We note that the Board affirmed the ALJ's award of 100 percent occupational disability with great reluctance. We, likewise, express the same reluctance but recognize the well-established boundaries and scope of our review. We find the Board's explanation of its holding on this issue to be sound and there-

fore adopt that portion of the Board's opinion herein as follows, to-wit:

We view the ALJ's finding of total occupational disability more troubling. Dr. Tsai expressed his judgment that although the claimant was precluded from lifting patients, overhead work and the use of vibrating tools, she, nevertheless, could perform light to medium work. Were this Board the trier-of-fact, we would not have granted a total award. However, it is not and our review function is limited. KRS 342.285, *Wells v. Hobart,* Ky.App., 708 S.W.2d 112 (1986). As of the time of final hearing the claimant was still under treatment and complained of constant pain in her neck and right shoulder. Although she admitted doing household chores, Sleets professed that she did them one-handed. And, we recall, she declared that she could not work as a nurses aid. The ALJ is afforded wide latitude in transforming this sort of evidence into a finding of occupational disability. *Seventh Street Road Tobacco Warehouse v. Stillwell,* Ky., 550 S.W.2d 469 (1976). The claimants [sic] own testimony is entitled to be weighted. *Caudill v. Maloney's Discount Stores,* Ky., 560 S.W.2d 15 (1977). *Hush v. Abrams,* Ky., 584 S.W.2d 48 (1979). *Ruby Construction Company v. Curling,* Ky., 451 S.W.2d 610 (1970).

Considering the claimant's marginal education, limited work experience, and physical restrictions we cannot declare that the ALJ erred in his application of the principles of *Osborne v. Johnson,* Ky., 432 S.W.2d 800 (1968). This Board notes that the claimant admitted some improvement in her condition, especially with respect to the left upper extremity. Likewise, Dr. Tsai suggested that the course of treatment and healing might last for a year beyond the time he was deposed. Should claimant's condition and occupational prospects improve, KRS 342.125, re-opening procedures provide a means for relief from the awesome burden of the award.

For the foregoing reasons, the opinion of the Board is reversed on the issue of apportionment of liability against the Special

Fund. All remaining issues raised by Treyton Oak are hereby affirmed.

All concur.