707 P.2d 422

**Patricia Rioux BRUCE,
Claimant-Respondent,**

v.

**CLEAR SPRINGS TROUT FARM, Employer, and Aetna Casualty and Surety, Surety, Defendants-Appellants,**

and

**State of Idaho, Industrial Special Indemnity Fund,
Defendant-Respondent.**

No. 15533.

Supreme Court of Idaho.

Sept. 23, 1985.

Glenn A. Coughlan, Boise, for appellants Clear Springs Trout Farm and Aetna Cas. and Sur.

Emil F. Pike, Twin Falls, for respondent Bruce.

Edward L. Benoit, Twin Falls, for respondent State of Idaho, Indus. Special Indem. Fund.

SHEPARD, Justice.

This is an appeal by employer Clear Springs Trout Farm and its surety Aetna Casualty, from a decision of the Industrial Commission that claimant Bruce is totally and permanently disabled as a result of an industrial accident which she had while employed by Clear Springs. Employer and surety also assert error in the commission's dismissal of the Idaho Industrial Special Indemnity Fund as a party. We affirm.

Bruce worked for the employer, cleaning, gutting, and weighing fish, starting in September 1977. At that time, she was 37 years old, had a work history limited to assembly-line jobs, and had an eighth grade education. On October 25, 1977, she slipped and fell on the tail of her spine. She immediately felt pain and numbness in her back and legs, and she left work to see a doctor. She was hospitalized for a week, during which she was examined and treated by several doctors. Following her release from hospitalization, she continued under doctors' care. She returned to work in December 1977 for less than two weeks, but then she terminated her employment, being unable to work due to pain in her back and legs.

During the following years, claimant saw several doctors, underwent at least two surgeries on her lower back, and experienced increasing pain in her back and legs. She was hospitalized for several lengthy periods of time and was usually confined to bed or wheelchair when she was at home. Her doctor rated her 40% impaired in July 1981, at which time her claim for worker's compensation benefits had not been settled. The depositions of seven doctors are a part of the record and indicate a considerable disagreement as to the extent and cause of claimant's inability to work.

Plaintiff testified to having had a troubled childhood and a traumatic first marriage. In 1975, she had been hospitalized for two weeks for an emotional disorder due largely to abuse inflicted upon her by her then husband. Prior to the October 1977 industrial accident, she had had several abdominal surgeries, but she testified that she had worked without pain or other problems prior to the industrial accident in question here.

The decision of the commission, dated February 2, 1984, found that claimant had a permanent partial impairment of 40% in the form of psychogenic pain syndrome, and that "this impairment was caused by the effects of the claimant's injury as it acted upon her preexisting personality disorder." However, the commission found "that the claimant did not have, prior to her accident, any permanent *physical* impairment." (Emphasis added.) The commission concluded that the claimant Bruce is totally and permanently disabled and that the employer/surety was responsible for the entire liability. Therefore, the Industrial Special Indemnity Fund was dismissed as a defendant.

The instant case is essentially a factual appeal. The employer and its surety assert that the commission erred in finding claimant to be totally and permanently disabled, and in finding that she had no preexisting disability such as would place a portion of the liability for her benefits upon the State of Idaho Industrial Special Indemnity Fund. *See* I.C. § 72–332 (regarding payment for special injuries from industrial special indemnity account).

We have said that the degree and cause of a claimant's disability are largely questions of fact, with the added requirement, however, that the commission's findings in that regard be supported by the record. *Carey v. Clearwater County Road Dept.,* 107 Idaho 109, 686 P.2d 54 (1984); *Arnold v. Splendid Bakery,* 88 Idaho 455, 401 P.2d 271 (1965); *Adams v. Bitco, Inc.,* 72 Idaho 178, 238 P.2d 428 (1951). The standard of review in such cases requires that the commission's factual determinations be affirmed, where they are supported by substantial competent evidence. Idaho Const. art. 5, § 9; I.C. § 72–732; *Wolf v. Kaufman & Broad Home Systems,* 106 Idaho 838, 683 P.2d 874 (1984); *Nelson v. Pumnea,* 106 Idaho 48, 675 P.2d 27 (1983).

■ The evidence before the commission and in the record here, while conflicting, is adequate to support the findings of the commission as to the total permanent disability and as to the lack of preexisting *physical* impairment. In relevant part, plaintiff testified:

"Q ... Now, Mrs. Bruce, ... Prior to your injury of October 25, 1977, had you had any previous injury to any part of your body from an accident?

"A Not that I can remember of.

"Q Did you have, prior to your accident of October 25, 1977, did you have any problem with your back in anyway?

"A No."

"Q Did you have any problem performing any work?

"A No."

And later, claimant testified:

"Q Did you, in your opinion, recover from that situation that you had with your husband?

"A Yes, I did. I totally recovered when I divorced him.

*       *       *       *       *       *

"Q After that, in your opinion, you didn't have any further problems?

"A No. The psychiatrist told me I didn't need to come see him anymore, that he thought I was in perfect condition, that I was handling myself quite well."

Claimant Bruce testified that, following her accident in October 1977, she had constant pain in her back and legs; she repeatedly fell if she tried to walk; she could not work, but had to stay home in bed or in a wheelchair; and the pain thereapy and acupuncture which she underwent were of little help.

Dr. Worst, a psychiatrist and trained physician with surgical experience, testified:

"A It's my psychiatric opinion, which is a medical opinion, since psychiatry is a specialty of medicine, that this lady does have a permanent psychiatric impairment, that her ability to function is permanently impaired in several different areas which I've previously described in this deposition, in terms of her ability to function in the daily tasks of life such as housekeeping, cooking, conversations with her husband, parenting her children, socializing with her neighbors, and more, and these are evidences of a psychiatric disorder which I've described and, in my opinion caused by the orthopedic injury which she sustained in October of 1977.

"Also it's my opinion that this impairment is permanent ... to the extent that she has made no progress ... in these areas, even though therapy has been available to her.

*       *       *       *       *       *

"Based on the Guidelines that I've reviewed from the American Medical Association, as I compare them with my findings, based on my examination, I believe this woman is, psychiatrically, 40% impaired.

*       *       *       *       *       *

"Q All right. Doctor, in your opinion is this lady psychiatrically retrainable into another field or occupation?

"A No.

*       *       *       *       *       *

"Doctor, in your opinion is Mrs. Bruce, in her present condition, employable in the gainful labor market?

"A In my opinion she is not.

On cross-examination, Dr. Worst responded as follows:

"Q Now, then, doctor, she—this lady then has or had a pre-existing impairment, did she not?

"A No, I'm not saying impairment. Simply because a person has a disorder doesn't necessarily mean that they have an impairment.

*       *       *       *       *       *

"Q She had a nervous breakdown, isn't that an impairment?

"A I'm not willing to accept the fact that she had a nervous breakdown. I was not there. Nervous breakdown is not a psychiatric term, it's a public term thrown around very loosely and very inappropriately. All I'm willing to accept is the fact the woman was in the hospital ... I didn't get to see the attending

physician's admission notes or anything of that nature ... I would not consider that an impairment."

Dr. Worst further testified, upon cross-examination:

"Q   I want to get it clear, you said the orthopedic injury was the cause of the psychogenic pain syndrome, isn't that what you said?

"A   Yes, that's what I said.

"Q   The injury happened then and caused the syndrome, is that right?

"A   That's correct."

Dr. Chapman, claimant's treating physician for a period of approximately three years and the surgeon who operated on her back at least twice, testified that claimant Bruce was impaired to the extent of 40%, and stated:

"Q   ... Would you explain how the anatomic loss which you have testified Mrs. Bruce has in her lumbar spine affects her ability to use her body.

\* \* \* \* \* \*

"A   The anatomic defect in her lumbar spine would limit her physical activity, certain movements would increase the pain, which approaches the level of incapacity ... This is, of course, aggravated by her emotional response to the ... physical impairment.

"Q   All right.  Doctor, you said that certain movement would increase her pain.  Would you describe in more detail what those movements would be?

"A   Any movements—standing, walking, twisting, bending, kneeling—any movement that cause [sic] motion in the lumbar spine."

Dr. Bronson, a psychologist and specialist in vocational rehabilitation, also indicated that claimant was severely impaired physically and was severely limited in her physical abilities.  He reviewed job classifications in which he considered claimant to be potentially eligible given her intelligence, neurological functions, and motor and verbal capabilities.  He was unable to find any job potential for claimant which was both within her physical capabilities and within her geographical area.  Dr. Bronson concluded his opinion with his view that claimant was "100 per cent unable to do significant work."

Notably, the employer and surety did not offer any expert testimony in the field of vocational rehabilitation, as it might have affected claimant Bruce.

■ · We affirm the holding of the commission, to the effect that claimant Bruce did not have a preexisting permanent *physical* impairment as that term has been interpreted under I.C. § 72–332.  We deem this holding to be correct and consistent with our holding in *Hartley v. Miller-Stephan*, 107 Idaho 688, 692 P.2d 332 (1984).  In *Hartley*, we held that a personality disorder can amount to a *physical* impairment, if such disorder manifests itself in some physical symptoms.  But we stated, as to Mr. Hartley's condition:

"[H]ere we are faced with the unambiguous statutory language of I.C. § 72–332, directing that the fund should pay for preexisting *physical* impairments. We think the personality disorder described here, apparently lacking any bodily symptoms whatsoever, is simply too tenuous to fall within the legislature's language of I.C. § 72–332."  107 Idaho at 690, 692 P.2d at 334.

*See also Jones v. State, Indus. Special Indem. Fund*, 104 Idaho 337, 659 P.2d 91 (1983) (fund not liable for asymptomatic previous injury which was not shown to have been a hindrance to employment); *Royce v. Southwest Pipe*, 103 Idaho 290, 647 P.2d 746 (1982) (requirement that preexisting condition be manifest in order to fall under I.C. § 72–332).

The decision of the Industrial Commission is affirmed in full.  Costs and attorney's fees to claimant-respondent Bruce, to be paid by defendants-appellants Clear Springs Trout Farm and Aetna Casualty and Surety.  Defendant-respondent Industrial Special Indemnity Fund has not requested its costs and fees on appeal, and therefore none are awarded.

DONALDSON, C.J., and BAKES, and HUNTLEY, JJ., concur.

BISTLINE, J., concurring in part and dissenting in part.

BISTLINE, Justice, concurring in award of total disability; dissenting from fixing all that liability on Clear Springs and its surety.

In order to competently assess the validity of the majority opinion, it is first necessary to understand that the opinions in *Hartley v. Miller-Stephan,* 107 Idaho 688, 692 P.2d 332 (1984) had not been announced when this controversy was being litigated and the Commission made its decision—a fact which the majority opinion deems insignificant and not worthy of mention. Claimant's injury was in late 1977, and the Commission's final decision was given on February 17, 1984. The first opinion in *Hartley* was not announced until July of 1984, and the substitute opinion was not announced until November 1, 1984.

The concern of the parties which was litigated was the application of *Royce v. Southwest Pipe of Idaho,* 103 Idaho 290, 647 P.2d 746, announced in 1982. *Royce,* in turn, was the progeny of two 1981 cases, *Curtis v. Shoshone County Sheriff's Office,* 102 Idaho 300, 629 P.2d 696 (1981), and *Gugelman v. Pressure Treated Timber Co.,* 102 Idaho 356, 630 P.2d 148 (1981). *Curtis* and *Royce* both dealt with whether pre-existing conditions "would reasonably cause a potential employer to be reluctant to hire a person ...." *Curtis, supra,* 102 Idaho at 305, 629 P.2d at 701. *Curtis* and *Gugelman* were both well-reasoned opinions.

*Royce,* however, contained language which obviously in this case perplexed both the referee and the Commission, and was the focal point of the litigation. The issue being litigated by the Industrial Commission was whether either, or neither, the employer or the employee knew of the pre-existing condition—"if no one knows of the condition it could not influence the employer and cannot be considered a hindrance to employment." *Royce, supra,* 103 Idaho at 294, 647 P.2d at 750. A reading of the transcript in the instant case discloses that the thrust of the Industrial Special Indemnity Fund was to establish that *no one knew,* and therefore all of the liability for total and permanent liability belonged to the surety. That there will exist no doubt in the minds of the readers, a resume of pertinent portions of the decision of the Commission is instructive.

The Commission, by first its referee, Robert C. Youngstrom, in its conclusions, properly approached the decisionmaking task by a review of statutory law and decisions of this Court (excluding the wrongly decided *Hartley* case—which had not been then announced):

> The type of *preexisting permanent physical* impairment which will trigger the liability on the part of the Industrial Special Indemnity Fund is defined as any permanent condition, whether congenital or due to injury or disease, of such seriousness as to *constitute a hindrance or obstacle* to obtaining employment or to obtaining reemployment if the employee should become unemployed. The Idaho Supreme Court has defined the term to include any preexisting permanent condition which would reasonably cause a potential employer to be reluctant to hire a person because of concerns that the condition would make him a less capable worker, a greater risk in terms of getting injured, or a greater risk in terms of the amount of potential permanent disability that the worker would suffer from an injury. Actual hindrance to one's attempt to obtain employment is not required. *Curtis v. Shoshone County Sheriff's Office,* 102 Idaho 300 [629 P.2d 696]; *Shea v. Bader,* 102 Idaho 697 [638 P.2d 894 (1981)]; *Gugelman v. Pressure-Treated Timber Company,* 102 Idaho 356 [630 P.2d 148]. The Court has also indicated that the condition must be manifest, *meaning that either the employer or the employee must be aware of the condition so the condition can be established as existing prior to the injury. Royce v. Southwest Pipe,* 103 Idaho 290 [647 P.2d 746].

R., pp. 33–34 (emphasis added).

From that point, still in Conclusion IV, the Commission turned to the facts:

*In this case, the Claimant had a preexisting personality disorder and had undergone several surgeries prior to her injury.* There is no evidence that the employer was aware of these facts. The Claimant was aware that she had undergone surgeries and knew that she had received treatment at one time for a nervous breakdown. The *evidence does not establish that the Claimant knew she had a personality disorder or that she had any mental condition which would have made an employer reluctant to hire her.* The Claimant had made a full recovery from her surgeries and the evidence does not establish that the surgeries were of a nature that an employer would have been reluctant to hire her if he had known of them. Workmen's compensation benefits are not limited to workers who, prior to the injury, were in perfect health or sound condition. *Wynn v. J.R. Simplot Company,* [105 Idaho 102, 666 P.2d 629 (1983)]. The evidence does not establish that the Claimant had a permanent physical impairment as defined by Section 72–332, IDAHO CODE, either mentally or physically, prior to her injury. *The Referee concludes that the Claimant did not have a permanent physical impairment which was manifest as required in Royce.* Therefore, the Industrial Special Indemnity Fund is not required to contribute to the payments due the Claimant for her total and permanent disability, and the entire amount is the liability of the Employer and Surety.

R., pp. 34–35 (emphasis added).

The view of the Referee (adopted by the Commission) was clearly stated. The claimant, as a matter of fact did have a pre-existing personality disorder, and was aware that she had surgeries, presumably occasioned by her personality disorder, and had received treatment for a nervous breakdown, but—the ultimate fact in the referee's rationale—the evidence does not establish that the claimant knew that she had the personality disorder or mental condition. This, found the referee, notwithstanding her carefully detailed medical history set out in Finding X:

The Claimant has an extensive medical history. She has had a hysterectomy, gall bladder surgery, appendectomy, the removal of an ovary, and approximately three exploratory surgeries related to adhesions in her abdomen. A medical report referred to by some of the doctors who testified in this matter indicated that the Claimant had experienced about thirty surgeries. This figure is not supported by the record, however. The Claimant also experienced what she refers to as a nervous breakdown occasioned by marital problems with her first husband. She was in the psychiatric ward of a hospital and treated by a psychiatrist for three or four weeks at that time. This occurred prior to her divorce. The Referee finds that the Claimant experienced no permanent impairment as a result of either her nervous breakdown or her numerous medical problems prior to her accident in October, 1977. The evidence indicates, on the contrary, that the Claimant made a complete recovery from all of these problems and *was experiencing good health at the time she commenced work at Clear Springs Trout Farm.*

R., pp. 20–21 (emphasis added).

After a thoroughly detailed review of extensive medical testimony, the referee made these ultimate findings relevant thereto:

## XX

The Referee finds, based upon all of the evidence in the record, that the Claimant is totally and permanently disabled based upon the permanent impairment that she suffers from her back injury and the permanent impairment from the psychogenic pain syndrome which resulted from her back injury. These medical impairments, together with the Claimant's limited education and

limited work skills, render her totally and permanently disabled. The Referee finds that the Claimant was totally and permanently disabled as of July 20, 1981 when, according to Dr. Chapman, she had reached a plateau in her improvement. No further improvement has occurred in her condition.

## XXI

The Referee finds, based upon Dr. Chapman's opinion, that the Claimant has a 40% permanent partial impairment of her back from orthopedic causes resulting from her accident and injury. The Referee finds, based upon the opinion of Dr. Worst, that the Claimant has a 40% permanent partial impairment for psychogenic pain syndrome. The Referee finds that this impairment was caused by the effects of the Claimant's injury as it acted upon her preexisting personality disorder.

## XXII

The Referee finds that the Claimant did not have, prior to her accident, *any permanent physical impairment.* Her *personality disorder has not been shown to have constituted a permanent physical impairment prior to her accident,* and it has not been established that the Claimant's prior medical problems and surgeries resulted in any permanent physical impairment which preexisted her accident. The Referee accepts the explanation of Dr. Worst as to the *effects of the Claimant's accident on her preexisting personality disorder,* because it appears to the Referee that his explanation *is the most clear and cogent* explanation of the reasons why the Claimant is in her present state of invalidism.

## XXIII

The evidence further shows that the Claimant exaggerates her symptoms and problems to some extent. For example, *she denied to Dr. Henson that she had been walking, yet the evidence shows that the Claimant is able to walk and does walk.* She is not totally confined to a wheelchair. There is also testimony by the doctors that they have seen a medical report indicating that the Claimant has had at least thirty surgeries. This information was apparently based upon a statement made by the Claimant to one of the doctors who treated her prior to seeing Dr. Chapman. The Referee believes that this statement is an exaggeration, as there is no evidence in the record to document that the Claimant has had anywhere near thirty surgical procedures. *The fact that the Claimant exaggerates her symptoms and complaints is found to be a symptom of her psychogenic pain syndrome.* The Referee does not believe it is deliberate or that it is evidence of malingering.

R., pp. 27–30 (emphasis added).

Understandably the surety was amazed that the referee and the Commission could, on that state of the record, declare that the claimant had such a severe pre-existing personality disorder, but then proceed to exonerate the Industrial Special Indemnity Fund on the basis that she was not aware of it. In extreme likelihood the employer, its surety and their counsel, envisioned that it simply could not be the state of the law that a mentally disturbed person not aware of the fact that she was mentally disturbed could swing the balance on the scales of justice simply by testifying that she had not been aware of the fact that she had endured a severe personality disorder. Understandably the employer and its surety appealed the decision.

Thereafter surfaced the remarkable opinion for the Court in *Hartley, supra.* Understandably counsel for the Industrial Special Indemnity Fund seized upon it for the proposition that a personality disorder, such as claimant was found to have had, was not as a matter of law a pre-existing permanent physical impairment which—whether known to the employer, or to the employee, or to both—would constitute a hindrance to becoming employed. With *Hartley* to turn to, it was then an easy

matter for the majority to completely avoid meeting the issue which was litigated before the Commission, and thus dispose of the appeal.

*Hartley* needs to be reconsidered. In the *Hartley* majority's final opinion of November 1, 1984, it was at the outset conceded that the statutory definition of permanent physical impairment was that set out in I.C. § 72–422: "any anatomic or functional abnormality or loss after maximal medical rehabilitation has been achieved." *Hartley, supra,* 107 Idaho at 690, 692 P.2d at 334 (1984). Notwithstanding such concession as to the plain written statement of the law, the majority was able to read into § 72–422 the word "physical" because it had appeared in § 72–322. Such cannot be done, but was done. Three members of the Court—with McFadden, J., sitting for Huntley, J., subscribed to the change in clearly worded statutory law. What prompted any member to do so is anyone's guess. Even without the benefit of a legal education and without the benefit of nearly 40 years in the profession, I would have thought that a mind not functioning normally was indeed a "functional abnormality." The statute is clear, and the word physical is unmentioned:

> **72–422. Permanent impairment.** —"Permanent impairment" is any anatomic or functional abnormality or loss after maximal medical rehabilitation has been achieved and which abnormality or loss, medically, is considered stable or nonprogressive at the time of evaluation. Permanent impairment is a basic consideration in the evaluation of permanent disability, and is a contributing factor to, but not necessarily an indication of, the entire extent of permanent disability.

Presumably the legislature, a goodlier number of persons than grace this Court's bench, was aware of nervous breakdowns and personality disorders when it defined permanent impairment for the people of Idaho—jurists included. More need not be said in that regard. This ground was ploughed by my separate opinion in *Hartley* where I observed that in *Curtis, supra* (a case on which I did not sit or partic-

ipate), the Court gave a definition of permanent impairment wholly in keeping with that of the legislature.

Notwithstanding that which I wrote in *Hartley* (which evoked not the least response from any member of the majority) the opinion for the Court took away a portion of the benefits which the Commission (reading § 72–422 and this Court's decisions) had awarded. The loser there was the claimant. Here, the shoe has been placed on a different foot—that of the surety—and the Industrial Special Indemnity Fund escapes while the surety has to pick up the entire tab. What was wrong and unjust for the claimant in *Hartley* is here as equally unjust and wrong for the surety. For that reason I am unable to join an opinion of the Court which is based on an application of *Hartley. Hartley's* rule should be overturned by the Court which announced it. Otherwise, I fear that employers and sureties, upon being made aware that it can be used against them as well as against claimants, will soon cause the legislature to overrule the Court as it did in *Utah Power & Light Co. v. Idaho Public Utilities Commission,* 105 Idaho 822, 673 P.2d 422 (1983).

Not only should the Court re-examine what it did in *Hartley,* but *Royce* is also ripe for a critical review. Notwithstanding that the Industrial Special Indemnity Fund seized upon *Hartley* to defend the decision of the Commission, it is rather apparent that certain cautioning language in *Hartley* gave some concern that it might not carry the day. For that reason, *Royce,* the mainstay of the Commission decision, was discussed in the brief of the Industrial Special Indemnity Fund, as well as in the surety's brief.

From the brief of the Industrial Special Indemnity Fund:

> In *Royce v. Southwest Pipe of Idaho,* 103 Idaho 290, 647 P.2d 746 (1982) this Court held that an objective test would be utilized by the Commission in determining pre-existing physical impairment. The Court held that "actual hindrance to

employment" was not required if a "condition would reasonably cause a potential employer to be reluctant to hire a person."

At page 294, 647 P.2d 746 the Court also said:

"... physical impairment. However, to constitute a 'hindrance to employment' the condition must be manifest. 'Manifest' means that either the employer or employee is aware of the condition so that the condition can be established as existing prior to the injury.

\* \* \* \* \* \*

... However, if no one knows of the condition it could not influence an employer and cannot be considered a hindrance to employment. Therefore, we hold that a *pre-existing physical impairment* within the meaning of I.C. § 72–332(2) **is any condition** which reasonably could constitute a hindrance or obstacle to employment or reemployment when all known facts are or could reasonably be disclosed to the employer." (Emphasis ours).

*Royce v. Southwest Pipe* was specifically upheld in *Jones v. State Indus. Special Indem. Fund,* 104 Idaho 337, 659 P.2d 91 (1983).

ISIF's Brief, pp. 14–15 (bold emphasis added).

From the brief of the employer-surety:

The actual requirement is set out in *Royce,* 103 Idaho at page 294, 647 P.2d 746 which states as follows:

"If the employer does not have knowledge of the preexisting condition, but the employee does, the employer will not be burdened by the lack of knowledge because it can be established that it was a preexisting condition thereby invoking ISIF liability. However, if no one knows of the condition it could not be considered a hindrance to employment. Therefore, we hold that a preexisting physical impairment, within the meaning of I.C. § 72–332(2) is any condition which reasonably could constitute a hindrance or obstacle to

employment or reemployment when *all known facts are or could reasonably be disclosed to the employer.*" (Emphasis added.)

The actual knowledge is not necessary by the employer. All that is required that pre-existing physical impairment within Idaho Code Section 72–332(2) is met, *when all known facts are or could reasonably be disclosed to the employer.*

Appellant's Brief, pp. 23–24 (emphasis in original).

Writing separately in *Royce* on the ambiguity of the passage above emphasized. I first observed that the *Royce* majority had repeated this language from *Gugelman, supra,* 102 Idaho at 360 n. 3, 630 P.2d at 152 n. 3:

The I.S.I.F. points out that many of the states require that the employer have knowledge of the condition for the I.S. I.F. to be liable. In this regard we need only note that Idaho has no requirement of such knowledge and we will not judicially impose such a requirement.

Following that statement, *Royce* immediately went on to add:

*We adhere to that holding, that employer knowledge is not a requirement to constitute a preexisting physical impairment.*

*Royce, supra,* 103 Idaho at 294, 647 P.2d at 750 (emphasis added).

Everything was just fine at that point, but the *Royce* majority went on to say that:

To constitute a "hindrance to employment" the condition must be manifest. "Manifest" means that *either* the employer or employee is aware of the condition *so that the condition can be established as existing prior to the injury. Id.* (Emphasis added.)

This language, isolated for examination, even though I did not agree with it because it was not compatible with both *Gugelman* and *Curtis,* was comprehensible.

But then followed in *Royce* the passage which counsel for the employer and Aetna emphasized in his brief:

"Therefore, we hold that a preexisting physical impairment, within the meaning of I.C. § 72–332(2) is any condition which reasonably could constitute a hindrance or obstacle to employment or reemployment when *all known facts are or could reasonably be disclosed to the employer.*"

Appellant's Brief, pp. 23–24 (emphasis added).

In examining that language in my *Royce* opinion, I observed my inability to understand it. A second effort suggests this: First, the majority opinion in *Royce* did adhere to the holding "that employer knowledge is not a requirement." That is compatible with the sentence that, paraphrasing, where the employee does have knowledge of the existing condition, and the employer does not, the lack of employer knowledge is no burden (i.e., problem, concern, worry, etc.) because the employee's knowledge of his pre-existing partial incapacitation invokes I.S.I.F. liability—to the benefit of the employer and its surety. The second sentence, "if no one knows of the condition it could not influence an employer and cannot be considered a hindrance to employment," remains a bewildering enigma as before. It probably was meant to convey the thought that someone, either the employer or the employee, *must have been cognizant* of the partial incapacitation, which knowledge must have existed at the time the employment commenced. The $64,000 question, then, is what to make of the declared *holding* of the *Royce* opinion:

"Therefore, we hold that a preexisting physical impairment, within the meaning of I.C. § 72–332(2) is any condition which reasonably could constitute a hindrance or obstacle to employment or reemployment when *all known facts are or could reasonably be disclosed to the employer.*"

*Id.* (Emphasis added.)

In attempting an analysis of this peculiar language, due regard must be given for the fact that the opinion wherein it is found has first made it crystal clear that employ-

er knowledge of the pre-existing impairment is not at all required. It is also difficult to conceive of a set of facts, if any, where the employer would know, but the employee would not know.

Here, beyond any equivocation, counsel for the employer-surety sees that language as bringing § 72–332(2) into play; i.e., that the known facts of the hindrance to employment reasonably either could be (could have been) disclosed to the employer, or, "are disclosed." While I do not believe that such was the thought behind the *Royce* Court's statement, it assuredly is capable of that interpretation. The referee clearly appears to have read *Royce* as requiring that the employer did have knowledge, and, if he did not, then, that the employee must have had knowledge.

The surety's brief, after presenting that passage from *Royce*, then proceeds to apply it to the testimony of Dr. Worst, which psychiatrist was *the* expert primarily relied upon by the referee, and in turn the Commission:

"Dr. Worst admitted that without claimant's pre-existing personality disorder there would have been no increase in her orthopedic disability as set forth in Dr. Worst's deposition on page 56, lines 6 through 26 and page 57, lines 1 through 14, which state as follows:

'Q. —and he said the woman had, in his opinion, I think, a 40% impairment.

A. Yes.

Q. If a person had been, say, well adjusted, can you tell me whether or not, in your opinion, that that might have been her impairment?

A. O.K., I see where you're going. I think that's reasonable. I think—I'm assuming he's referring strictly to an orthopedic impairment alone, so certainly people with healthy personalities can sustain an orthopedic impairment in my opinion, so—

Q. That's what she likely could have had?

A. I find that position believable, yes, that with a healthy personality she might have just ended up with only the orthope-

dic impairment, which I defer to Dr. Chapman's estimation, 40%.

Q. I'm not asking you to get into the field of—that field, I'm asking you to accept that—

A. I accept that.

Q. —that's part of the record.

A. I'll accept that that's the case.

Q. Then we come back to the situation of the premorbid personality in regard to Mrs. Bruce.

A. All right.

Q. And is it fair to say then that that's the cause of her increased disability over and above the orthopedic—

A. The orthopedic is the cause of her increased disability, her impairment, whatever word you want to use. Without the orthopedic injury you wouldn't have the psychogenic pain syndrome.

Q. *And without the premorbid personality disorder, you wouldn't have the increase in disability over and above—*

A. *Yes, I'd go along with that.'*

"Dr. Worst finally agreed that the pre-existing personality disorder was a very important factor in her psychogenic pain syndrome and that if an employer knew of her history he would not be wise to employ her as shown by the following testimony in Dr. Worst's deposition as follows:

Page 65, lines 19 through 25, page 66, lines 1 through 21:

'Q. Is this a fair statement, that this lady is a walking time bomb for a—and I use your words—a significant crisis, and *when she has that significant crisis, it's going to trigger this situation that she has, this psychogenic pain syndrome?*

A. Well, this woman has a significant pre-disposition, on the basis of a personality disorder, to have a psychogenic pain syndrome, given a severe life event.

Q. Now, doctor, that is an obstacle to her employment, is it not?

A. It might be if her employer was a psychiatrist.

Q. If she is exposed to injury—

A. In the sense that if an employer knew that this was the kind of lady he was dealing with, he would not be wise to employ her.

Q. *Probably would not employ her?*

A. *Probably wouldn't* if he could get by with it legally and he knew—and I guess that's why some employers are having psychiatrists and psychologists evaluate their people prior to employment, because he could predict that this lady might have some trouble.

Q. *In that sense it is an obstacle to employment?*

A. *If that's the way you want to use the term—*

Q. That's the way I want to use it, so if you will accept that, then—

A. Well, using that definition it could be, because *there would be employers who, if they were aware of this information would not wish to employ her.* (Page 67, lines 7 through 22):

Q. Now in Mrs. Bruce's situation, am I correct in this that *she would not have had the psychogenic pain syndrome* that you've described, *without the pre-existing personality disorder?*

A. Well, I can't say that for certain, but I think I would have to say that the *pre-existing personality disorder was a very important factor here.*

I don't think I could go so far as to say that a person must have, 100%, a personality disorder in order to have a psychogenic pain disorder, I'm not going that far, but I would have to say it's very important, the pre-existing personality disorder, is very important as an ingredient—

Q. And was in Mrs. Bruce's—

A. In her case, *it was absolutely very important as an ingredient in her ultimate psychogenic pain disorder.*

*A PRE-EXISTING, NON-DISABLING MENTAL CONDITION WHICH IS AGGRAVATED, AROUSED OR LIGHTED UP INTO A DISABLING REALITY BY INJURY IS COMPENSABLE AND THE INDUSTRIAL SPECIAL INDEMNITY FUND IS LIABLE FOR ITS PROPORTIONATE PART THEREOF.'*

"The claimant has a history of multiple operations consisting in part of an appendectomy, right ovariotomy, hysterectomy, left ovariotomy, three to seven abdominal exploratory surgeries and a gall bladder surgery all of which were related to and a factor in her pre-existing personality disorder (Holt deposition, pp. 10–11; Henson deposition pp. 12, L 18, pp. 13, L 1–19; Worst deposition, pp. 43, L 14–25, pp. 44, L 1–25, pp. 45, L 1–15).

*"The testimony of Doctors Holt, Henson and Worst establish that claimant had a pre-existing personality disorder. The unequivocal opinion was that this resulted in the numerous operations to which the claimant was subjected which directly meets the test enunciated by the court in Hartley v. Miller Stephen, et al., supra, as quoted.*

'Likewise, the physical symptoms indirectly caused by psychological illness might come within the definitions of physical impairment, pre-existing or otherwise.'

"Dr. Worst connected the personality disorder with the surgeries the claimant has as follows:

'I also know that one of the symptoms that one can see with personality disorders is *people become overly concerned about their health.* They can have a lot of—if they're not handling their life problems well because of this personality disorder, they can become overly involved in medical procedures and have unnecessary surgeries. So again I've got consistency, I've got background that is consistent with a personality disorder and I'm also seeing some symptoms frequently consistent with a personality disorder. I can't say for sure, I mean I have to always hedge, I don't have all her surgical history, but again from a great deal of medical experience I know that there are not very many people around that have had 30 surgeries, particularly people who have had seven exploratory surgeries. It's possible to have the appendix out, tonsils and so forth, but when you're talking of explor-

atory surgeries, seven of them—don't forget I'm a trained physician too, and I've had surgical experience.

That suggests that some of those exploratories, at least, may have been psychological, problems that were not being recognized, presenting themselves in the form of abdominal pain, and the doctors felt they had to explore to find the cause of the pain, which obviously they did not find, or they would not have had to do the same thing six other times.

So all of this is consistent with my diagnosis that she has a severe personality disorder, and did have, which made her vulnerable to another injury.' (Emphasis Added.)

Deposition of Dr. Richard Worst, pp. 44, L 13–26; pp. 45, L 1–15.

"As Dr. Worst stated, her personality disorder made her vulnerable to another injury and accordingly the personality disorder is directly connected to her injury of October 25, 1977. The physical symptoms caused by the pre-existing personality disorder were in this case a physical impairment.

"The court in *Hartley v. Miller, supra,* stated:

'The second injury principle behind industrial special indemnity funds should not be confined to loss of members, and has been extended to pre-existing psychiatric conditions.'

"Dr. Henson connected the claimant's surgeries with her pre-existing personality disorder as follows:

'Q. Okay. Well, assume, Doctor, that she was seen by Dr. D.F. Pletcher in Sun Valley on October 29 of '77 for examination, and at that time she reported to Dr. Pletcher that she had had thirty abdominal operations of one kind or another, some of which were a hysterectomy, cholecystectomy, appendectomy, right and left ovariectomy and other exploratories, would that kind of a history be significant to you in any way?

A. It would.

Q. In what way, Doctor?

A. Patients with functional disease or exaggerated complaints often have multiple and often unnecessary surgeries.

Q. In your opinion, would you state whether or not that would be related in any way to a preexisting personality disorder?

A. It would be.'

Deposition of Dr. Thomas E. Henson, pp. 12, L 18–25; pp. 13, L 1–9.

"An additional factor relating to claimant's pre-existing personality disorder is that fact that in 1975 she had to be hospitalized in the psychiatric ward at Weber Hospital in Bitteford, Maine for four weeks (Holt deposition, pp. 8, L 18–25; pp. 9, L 1–15; Exhibit 1, Holt deposition page 1; Worst deposition pp. 40, L 5–25, pp. 41, L 1–25; Henson deposition pp. 8, L 22–25, pp. 9, L 1–25, pp. 10, L 1–25, pp. 11, L 1–25, pp. 12, L 1–11).

"Both the psychiatric treatment and the excessive surgeries are *physical symptoms* coming within the definition of physical impairment.

"Notwithstanding the holding of the Industrial Commission dismissing the Industrial Special Indemnity Fund which we contend was error there is the principle as enunciated by *Ricky Coal Co. v. Adams*, 426 S.W.2d 464 (Ky.1968) which compels requiring participation of the second injury fund in compensating the claimant even though the claimant's condition may not have been manifested or a physical impairment as stated in *Hartley v. Miller-Stephan, et. al.*, case numbers 14670 and 14721. It is not necessary that the pre-existing mental condition be either manifest or a physical impairment to attach disability to the second injury fund.

"Claimant's pre-existing personality disorder was manifest and was a physical impairment under the facts of this case. But for the purposes of argument assume that it was not manifest the condition was aggravated and lighted up by the injury and, therefore, comes within the definition of physical impairment for which the second injury fund is liable. As stated in *Hartley, supra*, the court said:

'We do not hold that a psychological problem can never be compensated as a work related injury or impairment. Indeed the trend among the states in worker's compensation law is toward the opposite result.'

"The case of *Ricky Coal Co. v. Adams, supra*, clearly establishes that where a claimant has a pre-existing condition of a non-disabling mental type which was not disabling until aroused into disabling reality by injury part of the liability should be apportioned to the Industrial Special Indemnity Fund. This is the exact situation that exists in the case at bar. The claimant had a serious pre-existing personality disorder which was evidenced by hospitalization for a mental disorder and an excessive number of surgical procedures. Such disorder was non-disabling according to the contention of the claimant, however, this non-disabling disorder was triggered and lighted up by the injury as testified to by Dr. Worst. The decision in *Ricky, supra*, clearly sets out that the special indemnity fund is liable under these circumstances as follows:

'In the case at bar we have a pattern, a series of abnormal reactions to injuries on the part of the claimant, and the testimony of Dr. Wisel, who examined and tested Adams, that Adams suffered from conversion hysteria. We think the linkage of his previous reactions to his present reactions from his present injury is so marked that there is little doubt that Adams suffered from a pre-existing non-disabling mental condition, whatever it is called, which was lighted up by his latest accident. As early as 1972 in *Ashland Limestone Company v. Wright*, 219 Ky. 691, 294 S.W. 159, we recognized that a neurosis of traumatic origin is a compensable disability. And in *Old King Mining Company v. Mullins, et al.*, Ky., 252 S.W.2d 871 (1952) we held that a pre-existing neurosis is compensable to the extent it is aggravated by injury. To the same general effect are: *High Splint Coal Company v. Jones*, Ky., 338 S.W.2d 208 (1960); *American*

*Compressed Steel Corporation v. Blanton,* Ky., 357 S.W.2d 888 (1962); *Holland v. Childers Coal Company,* Ky., 384 S.W.2d 293 (1964); *E.I. DuPont De Nemours and Company v. Whitson,* Ky., 399 S.W.2d 734 (1966).

Larson on Workmen's Compensation Section 42.22 comments:

"There is almost no limit to the variety of disability 'psychic' conditions that have already been recognized as legitimately compensable-conditions which not many years ago would have received little understanding or recognition on the part of courts * * * Those cases denying compensation will usually be found to have done so not on the theory that traumatic neurosis is not compensable as such, but on the ground either that the evidence failed to establish a causal connection between the injury and the neurosis, or that there was no disabling neurosis at all."

We conclude that the evidence is so clear in the case at bar that Adams had a pre-existing condition or disease which was not disabling until aroused into disabling reality by his injury, that the Board should have apportioned part of the liability to the Special Fund as the employer contends. The appeal by the employer to the circuit court was in time.'

"The recent case of *Bartel v. Simplot and Argonaut,* 106 Idaho 174, 677 P.2d 487 (1984), involved permanent partial impairment for carpal tunnel syndrome and impairment for conversion reaction. Here the court approved the Commission's award for the conversion reaction rating. This case is cited in the opinion of *Hartley v. Miller Stephens, et al.,* 107 Idaho 688, 692 P.2d 332 (1984). In *Hartley* the court clearly states that psychological illness may come within the definition of physical impairment as follows:

"We do not hold that a psychological problem can never be compensated as a work-related injury or impairment. Indeed, the trend among the states in worker's compensation law is toward the

opposite result. *See* Larson, Workmen's Compensation Law §§ 42.20–42.24 (1982) (nervous injury resulting from trauma experienced in the scope of one's employment should be compensable as an industrial accident); Larson, *supra,* § 59.32(e) (the *"second injury" principle behind industrial special indemnity funds should not be confined to loss of members, and has been extended to preexisting psychiatric conditions).* Psychological disorders should be compensated, if they are proximately caused by the job environment and if they result in loss of earning capacity. *Likewise, the physical symptoms indirectly caused by psychological illness might come within the definition of physical impairment, preexisting or otherwise.* See *Bartel v. Simplot* [106 Idaho 174, 677 P.2d 487], Case No. 14694 (February 23, 1984; Larson, supra, § 59.32(e).'

"Cases which support the principal enunciated in *Ricky, supra,* are as follows:

"*Yocom v. Jackson,* 554 S.W.2d 891 (Ky. App.1977) involved a claimant who was injured in an automobile accident and was diagnosed as having a pre-existing dormant non-disabling condition. Pertinent statements from the opinion are as follows:

'If the employee were suffering from a preexisting nondisabling neurosis which became disabling following a subsequent injury, then liability could be imposed upon the Special Fund. Based upon the holdings in the Wright and Mullins cases, the pre-existing neurosis was considered a disease. *Ricky Coal v. Adams,* Ky., 426 S.W.2d 464 (1968). On the other hand, if the employee had only 'a low threshold emotional breaking point' which constituted a 'personality defect,' this was considered to be a 'condition' but not a 'disease condition' for which liability could be imposed upon the Special Fund.

. . . .

In *Ricky Coal Company v. Adams,* supra, the court quoted Larson for the proposition that, 'There is almost no limit to the variety of disabling 'psychic' condi-

tions that have already been recognized as legitimately compensable.'

"In *Young v. Bear Branch Coal Co.*, 434 S.W.2d 656 (Ky.1968) the Court cited *Ricky Coal Co.* and reversed the workmen's compensation board's holding that the special fund was not liable because the employees psychoneurotic disorder did not result from a pre-existing dormant but nondisabling condition.

"*Commonwealth of Kentucky Dept. of Economic Security, et al. v. Harris*, 441 S.W.2d 431 (Ky.1969) concerned the apportionment of apportionment of liability for back injury and dormant nondisabling preexisting neurotic condition between surety and the special fund. The Worker's Compensation Board charged one-half of the award to the special fund on the basis of the employee's pre-existing psychiatric condition citing among others the *Ricky Coal Company* case.

"Another case which held the special fund liable for psychiatric disability is *U.S. Fidelity & Guaranty Co. v. Florida Industrial Commission* 197 So.2d 1 (Fla. 1967) as follows:

'Where claimant's employer had notice of a pre-existing loss of sight in claimant's left eye, and claimant suffered a compensable back injury in his employment and shortly thereafter lost sight of his other eye from cataracts, unrelated to accident, and prior to award claimant became totally disabled from a psychiatric disorder attributable, according to undisputed evidence, 50% to industrial injury and its sequela and 50% to claimant's blindness, original loss of vision was a causative factor in producing psychiatric disability with which disability attributed to current injury had merged, and denying claim for reimbursement from special disability fund was improper.'

"*Subsequent Injuries Fund of Cal. v. Industrial Accident Commission*, 53 Cal.2d 392, 1 Cal.Rptr. 833, 348 P.2d 193 (1960) involved a claimant who was engaged in active naval service. In 1951 he developed nervous symptoms and was hospitalized for psychiatric observations for 22 days [as was the case with Mrs. Bruce here]. Claimant subsequently was employed by Bethleham where in November, 1953 he sustained an industrial injury when a sliver of steel entered his right eye. After brief hospitalization he returned to work but a month later he experienced a recurrence of nervous symptoms and was hospitalized and diagnosed as psychotic. A neuropsychiatrist after giving the claimant's history stated:

'From the above, it is my opinion that this man was suffering from a pre-existing personality disorder with borderline adjustment and that the industrial injury in November 1953 in which he lost the sight of his right eye aggravated this pre-existing disorder.'

"The Commission awarded 45% to the industrial injury and the balance to the fund which award was affirmed on appeal.

"In *Intermountain Health Care, Inc., v. Ortega*, 562 P.2d 617 (Utah 1977) claimant had a back injury due to lifting. Due to pain in her back, apparently followed and/or accompanied by psychosomatic pain she was unable to continue work. All of the claimant's disability was charged to the employer, the court said:

'The major difficulty in this case stems from the fact that the Commission found that the claimant had a pre-existing psychological condition relating to pain in her back, which combined with this accident resulted in permanent partial disability of 30 per cent, 10 per cent attributable to the pre-existing condition and the other 20 per cent to the accident.

\*    \*    \*    \*    \*    \*

Consequently, inasmuch as it appears that the pre-existing condition increased the resulting disability by one third, it follows that under the requirements of the statute, the medical expenses as well as the compensation award should have been apportioned two thirds from the employer and one third from the special fund.'

"It is noted that the *Ricky Coal Company* case is cited in the opinion stating:

'However, there is no doubt that such disorders would be an 'injury, disease or congenital cause' within the meaning of Sec. 35–1–69. For two cases which apportioned liability between the employer and the special fund when a pre-existing psychiatric disorder was present, see *Subsequent Injuries Fund v. Industrial Accident Comm.*, 53 Cal.2d 392, 1 Cal. Rptr. 833, 348 P.2d 193 (1960) and *Ricky Coal Co. v. Adams*, 426 S.W.2d 464 (Ky. 1968).'

## WHERE CLAIMANT HAS A PRE-EXISTING PHYSICAL IMPAIRMENT WHICH PROLONGS OR INCREASES HER DISABILITY THE EMPLOYER IS ONLY LIABLE FOR THE ADDITIONAL DISABILITY FROM THE INDUSTRIAL INJURY.

"The claimant had a very stressful childhood. She had been· abandoned by her parents at an early age and was mistreated by an uncle with whom she lived. She had an unhappy first marriage with mistreatment by her husband which resulted in her being placed in a psychiatric ward of a hospital for some four weeks. During claimant's adult life she was subjected to numerous abdominal operations. Claimant has been diagnosed by a number of doctors as having a pre-existing personality disorder. After claimant's back injury she focused on her condition to such an extent she had a "conversion reaction" and was convinced in her own mind that she could not work.

Claimant's permanent partial impairment regarding her back injury has been determined as follows:

'Panel examination of December 18, 1979, 25% of whole person (Ex. 1, Coughlin's deposition) Dr. Coughlin's examination of September 16, 1982 increased impairment rating to 30% of whole person (Ex. 2, Coughlin's deposition). Rating concurred in by Dr. Henson (Ex. 2, Henson deposition) Dr. Chapman rated claimant as having 40% loss of bodily function (Chapman deposition pp. 54, L 17–25, pp. 55, L–1).'

"The record establishes that the impairment as concerns the back injury does not exceed 40% of the whole person. This is the maximum· liability of the employer and surety, apportionment would reduce this.

"Any further additional disability is pre-existing for which employer and surety are not liable. Dr. Worst rated claimant as having a psychiatric impairment of 40% of the whole person (Dr. Worst deposition, pp. 34, L 23–25, pp. 35, L 1). This rating is based upon claimant's pre-existing personality disorder (Worst deposition pp. 55, L 4–25, pp. 56, L 1–21).

"Idaho Code 72–406 provides in part: '(1) In cases of permanent disability less than total, if the degree or duration of disability resulting from an industrial injury or occupational disease is increased or prolonged because of a preexisting physical impairment, the employer shall be liable only for the additional disability from the industrial injury or occupational disease.'

Accordingly, employer could be liable only for a maximum of 40% of the whole person impairment and is not liable for any impairment arising from the pre-existing condition.

It was error for the Industrial Commission not to apportion in this case, assessing liability to the employer only for the ratings as fixed by the panel, Dr. Coughlan and Dr. Chapman. The case of *Clark v. Brennan Const. Co.*, 84 Idaho 384, 372 P.2d 761 (1962) requires that this be done as follows:

'The Industrial Accident Board is authorized and required to find the causes of disability if attributable to more than one factor and to apportion the disability accordingly. This may require apportionment between an industrial injury and a pre-existing injury or infirmity, as well as between successive industrial injuries and such includes apportionment of hospital, medical and kindred expenses. I.C. § 72–323; *Cole v. Fruitland Canning Co.*, 64 Idaho 505, 134 P.2d 603; *Oliver v. Potlatch Forest*, 73 Idaho 45, 245 P.2d

775; *Harris v. Becthel Corporation*, 74 Idaho 308, 261 P.2d 818; *Beard v. Post Company*, 82 Idaho 38 348 P.2d 939; *Lindskog v. Rosebud Mines, Inc.*, ante, p. [84 Idaho] 160, 369 P.2d 580; *Andrus v. Boise Fruit & Produce Company*, ante, p. [84 Idaho] 245, 371 P.2d 256.'

"Defendant, employer, asserts, in the first instance, that the claimant consciously maximized and over-reacted as .found by the panel of doctors and others who examined and treated her and as a consequence she is not entitled to the rating given by the Industrial Commission. Accordingly, the employer should not have been charged with claimant's entire disability rating. Secondly, if it is found that the claimant is entitled to permanent total disability then the Industrial Special Indemnity Fund should be required to assume its proportionate share of the total rating." Appellant's Brief, pp. 24–39. (Emphasis added.)

It is compelling argument well supported by good authority. Against it there is claimant's testimony, some of which is set out in the majority opinion. Along with that, I.S.I.F.'s brief furnishes us with excerpts of claimant's testimony which is offered as being supportive of the Commission's decision:

BY MR. BENOIT:

Q   Mrs. Bruce, you remember July 23, 1981? We were in Mr. Pike's office and took a deposition? I'll tell·you that's the date, you remember?

A   Okay. I remember.

Q   And I asked you several questions. I assume you have read this deposition?

A   Yes, I have.

Q   I certainly don't want to get in an argument with you but Mr. Pike asked you a certain question and I just want to get it clear for the record.

A   Okay. I'll try.

Q   I understand that prior to October 25, 1977, that's when you were injured at the Trout Farm; prior to that accident, you have never had any accidental injuries to your body; is that correct?

A   Not to my knowledge.

Q   Never had. Further it is my understanding that prior to October 25, 1977, you were never hospitalized for any accidental injury to your body?

A   No, sir, I wasn't.

Q   And further I understand that prior to October 25, 1977, you suffered no broken bones in your body; is that correct?

A   Not that I could remember.

Q   Now, prior to October 25, 1977, you had never been injured on any job; had you?

A   No, I had not.

Q   Never been in an automobile accident, injured?

A   No.

Q   And prior to October 25, 1977, you did not have any back problems; is that correct?

A   That's correct.

Q   And all back problems you have commenced with the accident of October 25, 1977; correct?

A   Yes, sir.

Q   On October 25, 1977, you considered yourself in good health; did you not?

A   Yes, sir, I did.

Q   And do you know of any physical impairments or problems with your body that you had prior to October 25, 1977, which interfered with the work you were doing on October 25, 1977?

A   *I had no physical or mental impairment at that time to interfere with any job I was doing.* (Emphasis ours).

Q   Prior to the accident of October 25, 1977, did you have any difficulty in performing the work you were doing at the Trout Farm, prior to the accident?

A   Oh, before the accident?

Q   Yes

A  No, I did not. I was doing my work good.

Q  You were doing it without pain and without problem; weren't you?

A  Yes.

Q  Do I understand, then that as far as you're concerned all of your problems that you now have dated entirely from the accident of October 25, 1977; isn't that correct?

A  Yes, sir.

Q  All these back problems?

A  Yes.

Q  Now, as I understand, prior to October 25, 1977, you and your husband were happily married and everything was going fine; wasn't it, prior to the date of the accident?

A  Well, in 1977, I was not married to my husband at the time. We were going out and everything was good then.

Q  Everything was good. Would it be a correct statement to say that everything was going fine as far as your life was concerned until that accident on October 25, 1977; is that correct?

A  Yes.

Q  Prior to that accident your life was happy and everything was fine; correct?

A  Yes, before the accident everything was great.

Q  You were feeling good?

A  Yes.

Q  Then, the accident occurred?

A  That's right.

Q  That's when the troubles began?

A  Yes.

The opinions from this Court do not seem to be ambiguous or conflicting on one point. The question to be asked and answered is *not* whether the worker's impairment actually interfered with the work being done, but whether there was an impairment or disability, or partial incapacitation which could be an obstacle or hindrance to becoming employed.

The record in this case strongly militates against the claimant not having such an impairment, even though she could truthfully answer that she enjoyed "no physical or mental impairment" at the time she was injured on October 25, 1977. I still maintain that *Royce* was wrongly decided, as well as being poorly written. It went contrary to our immediately preceding decisions in *Curtis* and *Gugelman.* Unfortunately, I was unable to arouse even one member of the Court when I wrote:

In imposing a manifestation requirement the Court reasons: "'Manifest' means that either the employer or employee is aware of the condition <u>so that condition can be established as existing prior to the injury.</u>" (Emphasis added.) By the use of such language it is surmised that the Court's concern is that absent some observable manifestation prior to the industrial injury, who, then, can establish that the condition was indeed pre-existing? In this very case, the condition was not known to either the employee or the employer, yet the medical testimony left no doubt that the condition pre-existed the claimant's injury, and that the injury triggered the lighting up of the pre-existing physical impairment which theretofore was known to no one. If the Court's concern is with other claimants in other compensation cases, is it not true that the claimant or, as in the present contest, the employer and its surety will bear the burden of proving that the condition did in fact exist and did pre-exist the injury? Such speculative worry is true in all such cases, and in civil tort actions, as well, but cannot serve as a reason for the Court's imposition of a manifestation requirement.

Similarly, the Court states: "If the employer does not have knowledge of the pre-existing condition, but the employee does, the employer will not be burdened by the lack of knowledge because it can be established that it was a pre-existing condition thereby invoking I.S.I.F. liability. However, if no one knows of the condition it could not influence an employer and cannot be considered a hin-

drance to employment." The Court's reasoning is not readily understood. If I understood it, I would attempt a response. I mention only that in the preceding cases, *Curtis* and *Gugelman,* we heard argument that an employer not advised of or knowing of the employee's disability at the time of hiring, could not be said to have brought himself under the beneficent provision of I.C. § 72-332(2), but were not persuaded. **As in this very case, the fact that the condition existed prior to the injury, regardless of whether the employer or the employee had knowledge of that condition, was capable of proof, and was proved.**

*Gugelman* recognized that the I.S.I.F. was created for two purposes, "both to encourage the hiring of the handicapped and, as a corollary, to relieve employers of the unfair burden of paying total permanent disability compensation when only part of the disability was due to the industrial accident." 102 Idaho at 360, 630 P.2d at 152 (emphasis added). The Court's opinion in this case, however, only effectuates the first purpose, and totally ignores the second. Since the existence of a condition of which the employer is unaware, as in *Gugelman,* cannot influence the employer's hiring decisions, a fortiori, it is at once clear that the second purpose necessarily influenced the Court's reasoning, and prompted the decision in *Gugelman.* This instant case presents no reason for reaching a different conclusion. An employer should not be burdened by the lack of knowledge of a pre-existing condition at any time—provided only that the claimant or his employer can establish that the condition did in fact exist prior to the industrial accident. **No reason exists to draw or attempt a distinction between those cases in which the employee knew of the pre-existing condition, but did not inform the employer, and those cases in which neither the employee or the employer knew of the condition.** It is indisputable that in neither situation can the pre-existing condition influence the hiring decision of the employer. **If it is unfair in one situation to impose on the employer the cost of paying for total disability benefits where the total and permanent disability arose only in part from the industrial accident, it is equally unfair in the other.** The I.S.I.F. was established at least in part, for the purpose of relieving such an unfair burden to the employer. Not only is it inappropriate for this Court to impose a manifestation requirement, but it defeats at least in part the very purposes for which the I.S.I.F. was created.

*Royce, supra,* 103 Idaho at 297-98, 647 P.2d at 753-54 (underscoring original, bold added).

Today *Hartley,* in addition to *Royce,* is also said by the majority to stand in the way of any liability being affixed to the I.S.I.F. The majority requires a manifestation of the pre-existing condition, and that, relying on the language lifted from *Hartley,* if it be a personality disorder, it must have a *physical* aspect over and above an abnormal mental functioning.

In this case counsel for the surety-employer by his inquiring examination of Dr. Worst—who will be remembered as *the* expert of all experts relied upon by the Commission's referee—clearly established evidence that the claimant had in fact a pre-existing personality disorder—as found by the referee. It is inconceivable that the majority would wholly ignore the central thrust of the employer-surety's brief.